McCARTHY et al. v. BUNKER HILL & SULLIVAN MINING & CONCENTRATING CO. et al.

(Circuit Court of Appeals, Ninth Circuit. November 6, 1908.)

No. 1,397.

1. APPEAL AND ERROR (§ 1009*)—REVIEW—DECREE GRANTING OR REFUSING INJUNCTION.

It is a well-established rule that an appellate court will not ordinarily interfere with the action of a trial court in either granting or withholding an injunction in cases in which the evidence is substantially conflicting, and especially where the trial judge at the request of the respective parties has had the benefit of a personal inspection of the premises which are the subject of controversy.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3972; Dec. Dig. § 1009.*]

2. INJUNCTION (§ 23*)—ENJOINING LAWFUL BUSINESS—BALANCING OF EQUITIES.

Where it is sought to enjoin a lawful business, the court should give due consideration to the comparative injury which will result from the granting or refusal of the injunction sought.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 22; Dec. Dig. § 23.*]

3. INJUNCTION (§ 24*)—ENJOINING LAWFUL BUSINESS—COMPARATIVE INJURIES.

A court of equity properly refused to grant a permanent injunction which would necessitate the closing of mines and mills employing from 10,000 to 12,000 men and in which large capital was invested, practically destroying the business of important towns and markets for the products of many farms, because, as shown by a preponderance of the evidence, a comparatively small amount of damage was done by tailings discharged from the mills into a stream to farm lands below in times of overflow, where by the laws of the state the mines were given priority of right to the use of the waters of the stream and the owners had done all that could reasonably be done to prevent injury to others by the construction of dams and reservoirs for settling basins, and especially where actions at law commenced by many of the complainants to recover damages for the same acts of defendants were pending and undetermined.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 23; Dec. Dig. § 24.*]

Appeal from the Circuit Court of the United States for the Northern Division of the District of Idaho.

For opinion below, see 147 Fed. 981.

The bill in this case was filed in the court below November 23, 1904. It was brought by the appellants McCarthy, Raney, and Doty against the Bunker Hill & Sullivan Mining & Concentrating Company, Federal Mining & Smelting Company, the Gold Hunter Mining & Smelting Company, corporations, and Peter Larson and Thomas L. Greenough, copartners under the firm name and style of "Larson & Greenough." After alleging the jurisdictional facts, the bill averred that in the year 1891 McCarthy acquired under the homestead laws of the government, and has ever since owned and possessed, certain described tracts of land in Kootenai county, Idaho; that Raney also acquired, and has ever since owned and possessed, certain tracts of government land in the same county and state, and that the complainant Doty, on March 7, 1902, acquired under the homestead laws 151 acres in the same county and state, upon which he has since resided; that all of the tracts so owned by the complainants are situate in the valley of the Cœur d'Alene river, contiguous to that stream, level, and prior to the acts complained of were of great fertility and value, producing large and valuable crops of hay, grain, vegetables, and other agricultural products, a large portion of the land being a natural meadow; that the aggregate value of the complainants' land and that of their associates represented by them, as afterwards alleged, is more than $800,000; that at the time the complainants, and nearly all of the parties mentioned in the bill as their associates, acquired their land, and before the acts of the defendants complained of, the waters of the Cœur d'Alene river and its tributaries were pure, clear, and wholesome, abounding in trout and other food fish, and were in every respect adapted to use for domestic purposes and the watering of stock, and the channel of the stream was very deep and navigable for steamboats of large size and deep draught from its confluence with Lake Cœur d'Alene to a point about 35 miles above called "Mission," and was so navigated daily by large boats to said point and by smaller ones about 14 miles further up the river, which boats passed near the lands of the complain-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ants and their said associates, furnishing them with valuable and economical facilities for commerce and transportation for the products of their farms and for the bringing in of supplies and continuous travel, without change of conveyance, from Mission to Cœur d'Alene City on Lake Cœur d'Alene, about 60 miles therefrom, and to other towns and landings on said river and lake and other streams flowing therein, the competition of which boats kept down charges for freight and passenger rates to a reasonable and inexpensive charge, and also compelled the Oregon Railroad & Navigation Company, which operates a railroad along the river and lake, and very near thereto, to keep down the charge of freight and passenger rates to a low and reasonable charge; that the river and its tributaries, particularly the south fork of the stream, also furnished the complainants and their alleged associates with valuable and convenient facilities for floating timber, logs, cordwood, railroad ties, and like commodities from points along the river and from their own farms to the city of Spokane, in the state of Washington, where are situated mills for the manufacture of lumber and like commodities; that sometime prior to the year 1888, the defendant the Bunker Hill & Sullivan Mining & Concentrating Company became the owner of certain mining claims located in Shoshone county, Idaho, under the provisions of the mining laws of the United States, such mining claims being situated upon and in the hills overlooking and contiguous to Milo creek, a tributary of the south fork of the Cœur d'Alene river, and many miles above where the river flows by and through the lands of the complainants and their alleged associates; that, after acquiring these mining claims, the Bunker Hill Company commenced to extract the ores and minerals therefrom, and have since continued so to do, and threaten to do so indefinitely; that, in working its claims, that company has extracted and is continuing to extract therefrom, and threatens to continue so to do, great quantities of lead and silver ores, which require and will require treatment to separate the lead, silver, and other minerals from the base rock and earth in which they are found, for which purpose the Bunker Hill Company, about the year 1899, erected upon the banks of the south fork of the Cœur d'Alene river, at a point more than 50 miles above where the river flows by and through the lands of the complainant Doty, and a greater or less distance above where it flows through the lands of the other complainants and their alleged associates, a mill or concentrator, where it has ever since continued to treat the ores, with the results afterwards stated; that, from the time of the erection of the concentrator or mill, that company has run through it, and is still running through it, about 2,000 tons of ore per day, about 75 per cent. of which consisted and still consists of rock and earth, which, after the lead, silver, and other valuable minerals are extracted, is cast by the defendant into the said south fork of the river or upon the banks thereof, which deposits are from time to time, by the natural action and drainage of the waters, washed and carried into the south fork and thence into the Cœur d'Alene river, resulting in the filling up of its channel and the poisoning and polluting of its waters; that the said company's method of working the ores requires the flowing of a large stream of water through its concentrator in the process of treating the ores, which water becomes so charged with lead and other poisonous material that it is rendered destructive to all vegetation with which it comes in contact, and poisonous to any animals which drink of such waters or eat of any vegetation which has been overflowed by them, or which have been grown upon the lands through which such waters have percolated or flown, and is poisonous to fish within said waters; that such waters, after so flowing through the said concentrator and being so polluted and poisoned, have been by the said company, during the times stated, and still are and will continue to be, unless enjoined therefrom, turned into the said south fork of the Cœur d'Alene river, whence the same naturally flows by and through the lands of the complainants and their alleged associates; that the continued depositing by the Bunker Hill Company of crushed rock and material and débris into the said south fork of the Cœur d'Alene river and upon the banks thereof has filled up the channel of the south fork, and since about the year 1900 has been and is now rapidly filling up the channel of the river itself, where the same flows by and through the lands

of the complainants and their alleged associates, to the extent that the river is no longer well defined and its banks rise but little above the stream at low water, so that any slight rise in its waters causes it to overflow its banks and spread over the lands of the complainants and their alleged associates; that the waters of the river are so poisoned and polluted by the aforesaid acts of the Bunker Hill Company and the other defendants that when the river overflows, its waters poison and destroy all vegetation with which they come in contact, and, when they recede, leave a deposit of poisonous sediment that not only destroys vegetation and animal life with which it comes in contact, but destroys and tends to unfit the land for further cultivation.

The bill further alleges that the defendant the Gold Hunter Mining Company, about the year 1886, became the owner of certain mining claims in Shoshone county, under the mining laws of the United States, situated near the town of Mullan, upon the south fork of the Cœur d'Alene river, and for the purpose of treating ores therefrom did likewise erect upon the banks of the south fork, near the town of Mullan, and at a point about 20 miles above where the mill and concentrator of the Bunker Hill Company is situated, and has continued to treat its ores in the same manner and with the same results as is alleged with respect to the Bunker Hill Company; that the defendant Federal Mining & Smelting Company, about the year 1902, acquired certain mining claims, by conveyance from former owners, situate in the hills and mountains overlooking the aforesaid Milo creek, and in the hills and mountains overlooking Canyon creek, a tributary of the south fork of the Cœur d'Alene river, at or near the town of Mace, and have ever since been the owners of two large concentrators or mills, one situate near the town of Kellogg, on the south fork of the river, and the other at the town of Mace, on Canyon Creek, through which defendant has run 2,000 tons per day in like manner and with like results as is alleged with respect to the Bunker Hill Company, and threatens that it will continue to do so indefinitely.

That the defendant Hecla Mining Company, about the year 1898, became the owner of certain mining claims situate in the mountains and hills overlooking the said Canyon creek, at or near the town of Burke, about 20 miles above the mill or concentrator of the Bunker Hill Company, and, for the purpose of treating its ores, erected at or near the town of Burke, and on the banks of Canyon creek, a mill or concentrator, through which it has since run 800 tons of ore per day with like results and in like manner as is alleged with respect to the Bunker Hill Company, and that it will continue so to do indefinitely.

The bill alleges that for many years after the commencement of the operation of the mills or concentrators by the several defendants, as alleged, and for many years after, the complainants and nearly all of their alleged associates severally acquired their respective tracts of land in the valley of the Cœur d'Alene river, the waters of the river were not perceptibly affected by the débris and waste discharged into the tributaries of that stream by the several defendants, for the reason, among others, that there were many pools and deep places in the tributaries where such débris and waste settled, and for the further reason that the amount of ore treated in such mills and concentrators and the amount of waste and débris discharged by the defendants was comparatively small; but from time to time since the first construction of the mills and concentrators each of the defendants has greatly increased the capacity of its mills and concentrators, resulting in an increased discharge by each of them of waste into the tributaries of the river, resulting in the filling up of the pools and deep places and the carrying of such waste further down the stream, so that by the year 1900 such waste and débris commenced to be discharged into the channel of the river itself in large quantities, so that the waters of the river became appreciably polluted thereby, since which date such waste and débris has been discharged in greater and ever-increasing quantities, so that the channel of the river for several miles below the point called "Mission" has been filled up to such an extent that the navigation thereof, even by small boats, has been entirely destroyed excepting during the period of high water; that the channel

of the river has been filled up to such an extent that the banks rise but slightly above the deposits of the waste and débris, and in places the channel has been filled up to more than a depth of 60 feet, according to the information and belief of the complainants, and that the entire channel of the river to the south thereof has been filled up to an ever-increasing degree, and that considerable quantities of pollution caused by such waste and débris is now being carried into Cœur d'Alene Lake, and, unless the defendants are restrained, the entire channel of the river will, by the constant accumulation of the waste and débris, become unnavigable; that such pollution has already destroyed or driven away from the stream all fish; that such waste and débris has already been carried upon the lands of the complainants and their alleged associates to such an extent that many acres of the said lands are now covered with such waste and débris to such a depth as to destroy all vegetation, and that, as the flow of such waste and débris increases from year to year, the area so destroyed is constantly and rapidly enlarging, and that the other lands of the complainants and their alleged associates which are not thus destroyed are being greatly impaired in their fertility and capacity to produce crops; that the pollution caused by the waste and débris settles upon and attaches itself to the growing grass and all vegetation, and incrusts the same with a sediment which is highly injurious to such growing crops and poisonous to all animals that feed thereon, and that when such crops are harvested the sediment deposited on the ground arises in clouds of poisonous dust which diffuses itself through such crops, thereby greatly augmenting its deleterious effect on animals which feed on the same, in consequence of which many horses and cattle belonging to the complainants and their alleged associates have sickened and died, and many more have become sick and diseased, the general knowledge and reputation of which fact among the people of that region has already greatly impaired the marketability of hay and other crops grown on the said lands, so that the merchants and dealers, who were accustomed to buy at the highest market value the products of said lands, refuse now to purchase the same excepting at greatly diminished price, or at all; that, if the defendants are restrained from further continuing the acts complained of, the lands of the complainants will become fertile and productive, and the crops growing thereon merchantable and fit for use and for feeding of domestic animals, excepting such portions as are already covered with such sediment and waste as to have already destroyed their fertility; that at the time the complainants and their alleged associates acquired their land it could not be foreseen or apprehended that the amount of mineral-bearing ore in the vicinity of the tributaries of the river would ever be sufficient to pollute the waters thereof, or destroy their lands; that ever since the lands of the complainants and their alleged associates commenced to be seriously damaged by the acts of the defendants, complained of, the former have made repeated efforts to induce the defendants to take some steps to protect them from such damages and the other damages threatened, and to compensate them for the damages already suffered, but the defendants have failed and refuse to provide any relief for the injuries complained of, but, on the contrary, conspired with others and organized themselves with others into an association known as the "Mine Owners' Association," the purpose of which organization was and is to prevent the complainants and their alleged associates, and others similarly situated, from securing any redress, and to enable them by such combination to continue the alleged unlawful acts complained of, and to harass them with vexatious, expensive, and ruinous litigation, the complainants and their alleged associates being men of small means and for the most part having no property or resources aside from their said lands and the crops grown thereon, so that the complainants and their alleged associates were compelled to associate themselves together for the purpose of mutual aid and assistance in securing redress for the alleged wrongs, of which association the complainant Raney is president, and the complainant McCarthy secretary, the said association being composed of the following named persons, each of whom is the owner of a valuable farm in the valley of the Cœur d'Alene river, in all respects similar to the farms of the complainants, the lands and crops of each

of whom is being injured and damaged in the same manner and with like effect as the lands of the complainants; such alleged associates being D. E. Blair, William Ehlert, Harry Weigel, A. J. Rasor, John Graf, E. M. Newcomb, W. S. Snider, David Brown, R. D. McKinnis, Archille Fortier, Samuel Reed, Chas. Smith, Johanna Hurlinger, Mary R. Schaughnessy, Chas. McMillan. R. W. Bacon, Carl Graf, M. J. Sanders, Chas. Fisher, Alva Ellis, J. H. Mauck, Joseph M. Brown, T. K. Hireen, L. C. Armstrong, Wm. Gasgel, L. P. Hyde, David Holderman, John Fisher, A. J. Snyder, P. L. Roscoe, Martin Arnold, Andrew Bergstrom, William Byers, Mary E. Brown, Walker R. Davis, J. E. Eells, R. A. Grover, Alfred W. Jansen, Martin Kottnek, John H. Mottern, Edmund D. Oman, Elmer Packer, Mrs. William Alcenda Payne, P. J. Whalen, Clarence A. Packer, Thomas E. Williamson, Theresa Jorgens.

The bill further alleges "that your orator, Elmer Doty, has already brought legal actions in your honorable courts to recover damages from the said defendants for injuries to his own lands and crops and to the lands and crops of those associated with him, which actions at law, on account of the large number of defendants, all of whom have contributed to the said injuries, are very vexatious and expensive to your said orator and his said associates, and that since the commencement of said actions these defendants have continued to do and commit all of the acts complained of, and are still so committing such acts, and since the commencement of said actions the lands and crops of your orator, and those associated with him, have been greatly damaged by the acts complained of as done and committed by these defendants, and, unless said defendants are restrained and enjoined by your honors from a further continuance of the acts complained of, your orators and those associated with them will be compelled to enter into innumerable actions at law to recover their just damages resulting from the acts complained of, which constitute a public nuisance and a continuing trespassing upon the lands of your orators and those associated with them, and a great multiplicity of suits will necessarily result."

The bill further alleges that the defendants thereto, and each of them, claim the right to operate their said mining claims and their said mills and concentrators, and to deposit the rock, earth, and other débris therefrom, where the same will be carried into the waters of the Cœur d'Alene river and its tributaries, under and by virtue of the provisions of the act of Congress, approved July 26, 1866 (14 Stat. 251, c. 262), entitled "An act granting the right of way to ditch and canal owners over the public lands and for other purposes," and the act amendatory thereof, and particularly under sections 5, 8, and 9 of the act of July 26, 1866; and under the provisions of the act of Congress, approved July 9, 1870 (16 Stat. 217, c. 235), entitled "An act to amend an act granting the right of way to ditch and canal owners over the public lands, and for other purposes," and particularly under the provisions of section 17 of the last-mentioned act; and under the provisions of the act of Congress, approved May 10, 1872 (17 Stat. 91, c. 152), entitled "An act to promote the development of the mining resources of the United States," and the acts amendatory thereof and supplementary thereto; and under the provisions of section 14 of article 1, and of sections 1 and 3 of article 15, of the Constitution of the state of Idaho, which provisions of the Constitution of the state, the defendants, and each of them, claim were adopted under authority vested in that state by the provisions of the aforesaid mining acts of Congress—all of which claims the complainants deny, and aver that their said rights in and to their said respective tracts of land were initiated and attached to such lands under the provisions of chapter 5, tit. 32, of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 1388), and the acts of Congress amendatory thereof, and that the provisions of the Constitution of Idaho. if construed as the said defendants claim and pretend that they should be construed, are, as applied to the rights of the complainants and their alleged associates, in conflict with the provisions of section 3 of article 4, and the fifth and fourteenth amendments to the Constitution of the United States. The prayer of the bill is, among other things, for a preliminary and perpetual injunction against the commission by the defendants of any of the alleged unlawful acts.

By their answer the defendants put in issue all of the material allegations

of the bill, and set up, among other things, that in the year 1900 the Buffalo Hump Mining Company was the owner of the Tiger and Poorman and other mining claims situate at the town of Burke, on Canyon creek, and engaged in mining them, and, in connection with that work, owned and operated large concentrating mills at Burke, having a capacity to crush and treat, and which were then crushing and treating, about 600 tons of ore daily; that at the same time the Standard Mining Company was the owner of the Standard and other mining claims situated near the town of Mace, on said Canyon creek, and engaged in mining them, and, in connection with such work, owned and operated a large concentrating mill near the mouth of Canyon creek, which mill had the capacity to crush and treat, and was then crushing and treating, about 600 tons of ore daily from its said mines; that at the same time Richard Wilson, Walter Mackay, James Leonard, William R. Leonard, A. L. Scofield, and the Standard Mining Company owned the Mammoth and other mining claims near said town of Mace, on Canyon creek, and were engaged in mining them, and, in connection therewith, owned and operated a large concentrating mill situated near the mouth of Canyon creek, which mill had the capacity to crush and treat, and was then crushing and treating, about 400 tons of ore daily from their said mines; that at the same time the defendants Peter Larson and Thomas L. Greenough, were the owners of the Morning and Evening and other mining claims situate near the town of Mullan, in the county of Shoshone, on the south fork of the Cœur d'Alene river, and were engaged in mining them, and, in connection therewith, owned and operated a large concentrating mill near the said south fork, and about one mile below the town of Mullan, which concentrating mill had the capacity to crush and treat about 900 tons of ore daily from their said mines; that at the same time the defendant the Gold Hunter Mining & Smelting Company was the owner of the Gold Hunter and other mining claims on the south fork of the Cœur d'Alene river, near said town of Mullan, and was engaged in mining them, and, in connection therewith, owned and operated, near its said mines, a concentrator which had the capacity to crush and treat about 250 tons of ore daily from its said mines; that, at the same time, the defendant Hecla Mining Company was the owner of the Hecla and other mining claims situate near the said town of Burke, on Canyon creek, and was engaged in mining them, and, in connection therewith, was operating a concentrating mill on Canyon creek, with a capacity for crushing and treating about 120 tons of ore daily from its said mines; that in the year 1900 the said owners of the said several groups of mines and mills, and other mine owners, for the purpose of holding and impounding any tailings and waste material produced by the said mines and mills which might escape from their separate and respective works, dams, and impounding reservoirs, purchased a large tract of land, to wit, over 300 acres, in the valley of the south fork of the Cœur d'Alene river, at a point about three miles below the city of Wallace, Idaho, and during the spring and summer of 1901, at great cost and expense, erected thereon a large dam, known as the "Osborn Dam," across said south fork of the Cœur d'Alene river and across a portion of the valley of the said south fork, thus making a large reservoir or storage basin for the holding and impounding of such tailings and other waste material from said mines and mills as might escape from their separate and respective works, dams, and impounding reservoirs; that said reservoir or storage basin is, and has at all times since its construction been, of sufficient size and capacity to catch, hold, and impound all tailings and waste material from the working of said mines and the operation of said concentrators, and is of sufficient size and capacity to catch, hold, and impound all the tailings and waste material which may be produced by the working of said mines and the operation of said mills for many years to come, and is capable of being enlarged so as to accommodate, hold, and impound all the tailings and waste material which may in the future be produced from said mines, as well as any other mines which may be developed on the south fork of the Cœur d'Alene river and its tributaries above said dam; that in the year 1901, and at divers times prior thereto, the said defendants Bunker Hill & Sullivan Mining & Concentrating Company, the Gold Hunter Mining & Smelting Company, Hecla

Mining Company, and Larson & Greenough, and the grantors and predecessors in interest of Federal Mining & Smelting Company, and other mine owners, for the purpose of holding and impounding any tailings and waste material produced by their said mines and mills which might escape from their separate and respective works, dams, and impounding reservoirs, purchased large tracts of land, to wit, in the aggregate about 2,000 acres, in the valley of the south fork of the Cœur d'Alene river, at a point about four miles below the town of Kellogg, Idaho, and about two miles below the said mill and impounding works of the said defendant Federal Mining & Smelting Company, and, during the fall and winter of the year 1902, at great cost and expense, erected thereon a large dam known as the "Pine Creek Dam," across the said south fork of the Cœur d'Alene river and across the entire valley of the said south fork of the Cœur d'Alene river, thus making a large reservoir or storage basin for the holding and impounding of such tailings and other waste material from their said mines and mills as might escape therefrom and from their separate and respective works, dams, and impounding reservoirs; that said reservoir or storage basin is, and has at all times since its construction been, of sufficient size and capacity to catch, hold, and impound all the tailings and waste material from the working of said mines and the operation of said concentrators, and is of sufficient size and capacity to catch, hold, and impound all the tailings and waste material which may be produced by the working of said mines and the operation of said mills and concentrators for many years to come, and is capable of being enlarged so as to accommodate, hold, and impound all the tailings and waste material which may in the future be produced from said mines, as well as from other mines which may be developed on the south fork of the Cœur d'Alene river and its tributaries above said dam; that at all times since the construction of said dams and storage basins, down to and until the present time, all the débris and waste material which have, in the process of mining and milling of their respective ores, escaped from their respective mills, works, dams, and impounding reservoirs and been carried away by the waters of the said south fork of the Cœur d'Alene river and its tributaries, and each thereof, have been caught, held, and impounded in said dams and storage basins, and none of the same has floated down or been carried down below said dams; that the lands claimed by the complainants, and each of them, and those associated with them and whom they claim to represent, and each of them, mentioned and described in the bill of complaint, are situate in the valley of the Cœur d'Alene river below said Osborn dam from 21 to 56 miles, and below said Pine Creek dam from 10 to 45 miles, and that at no time since the construction of said dams have any tailings or other waste material from the working of any of said mines or the operation of any of said mills or any mines or mills on the south fork of the Cœur d'Alene river, or any of its tributaries above said dam, ever floated down or been washed or carried down to said lands or any part thereof or any lands claimed by the complainants or their associates, or any of them, or to any point below said dams; that said Osborn dam is located more than three miles below the nearest of the mills and about ten miles from the farthest of the mills of the defendants that are situated above said dam, and that the Pine Creek dam is located about eleven miles below the said Osborn dam, and two miles below said Federal Mining & Smelting Company's mill, which is the lowest mill on the south Fork of the Cœur d'Alene river; that the mill of the defendant Bunker Hill & Sullivan Mining & Concentrating Company and the said last-mentioned mill of the defendant Federal Mining & Smelting Company are the only mills operated between the said Osborn and Pine Creek dams; that the said Pine Creek dam is below the mines and mills of the said defendants and every mine and mill that is operated in the county of Shoshone, Idaho, upon the south fork of the Cœur d'Alene river or any of its tributaries; that the said defendant Bunker Hill & Sullivan Mining & Concentrating Company now is, and at all times during its mining and milling operations in the said county of Shoshone, Idaho, has been, working and operating its mines and mill on its own account, separately and independently of all other persons or companies, and that, ever since the construction of said dams and storage basins, it has borne and paid its share

of the costs and expenses of keeping up and maintaining the same; that the said defendant Federal Mining & Smelting Company was never engaged in any mining or concentrating or treating of ores prior to the 1st day of September, 1903, on which day it acquired by purchase all the mines, mills, water rights, and all the property of said the Standard Mining Company, the Empire State-Idaho Mining & Developing Company, and the said Richard Wilson, Walter Mackay, James Leonard, William R. Leonard and A. L. Scofield, being the same mines and mills above mentioned as belonging to them, together with their interest in said dams and storage basins, and ever since has been and is now working and operating said mines and concentrators on its own account, separately and independently of all other persons or companies; and ever since said purchase said defendant Federal Mining & Smelting Company has borne and paid its share of the costs and expenses of keeping up and maintaining said dams and storage basins; that the said defendant the Gold Hunter Mining & Smelting Company now is, and at all times during its mining and milling operations in the said county of Shoshone has been, working and operating its mines and mills on its own account, separately and independently of all other persons or companies, and that, ever since the construction of said dams and storage basins, it has borne and paid its share of the costs and expenses of keeping up and maintaining the same. Similar allegations to the last are also made in the answer in respect to the Hecla Mining Company and the defendants Larson & Greenough.

The answer further avers that, in the mining and working of said mines, and the crushing, concentrating, treating, and separation of the metals from the gangue and waste rock, no poisonous or deleterious substance or substances destructive to animal or vegetable life are used by the said defendants, or any of them, nor do they use anything but pure water therein, and in the concentration and treatment of said ores no poisonous or deleterious substance or substances destructive to animal or vegetable life are left in the tailings or waste material; and so the defendants aver that the complainants have not, nor has either or any of them, nor their associates or either or any of them, directly or indirectly, suffered any wrong, injury, or damage at the hands of the said defendants or any of them, or by reason of any work, act, or thing done by the said defendants, or any or either of them; that, for a period of over 15 years prior to the commencement of this suit, other mining companies and persons than the defendants herein, owning and operating their respective mines and properties in the county of Shoshone, Idaho, mined, milled, treated, and concentrated their ores and used the waters of the south fork of the Cœur d'Alene river and its tributaries above the lands claimed by the said complainants and their said associates in the mining, milling, and concentration of their ores and ore bodies, and that, if the said complainants, or any or either of them, or their associates or any or either of them, ever suffered any damages or injuries complained of in their bill of complaint, which the defendants deny, such damages or injuries, and each thereof, if in any manner caused by any mining and milling operations and the use of the waters of the south fork of the Cœur d'Alene river and its tributaries in such mining and milling operations, were caused by such other companies and persons, and not by the defendants herein, or any or either of them; that if any poisonous or destructive or deleterious substances or material or any minerals have been or can be found in the channel of the Cœur d'Alene river, or on the lands, or any part thereof, of the said complainants, or either of them, or their associates, or either of them, or in the valley of the said Cœur d'Alene river, as the result of any mining or milling operations in the county of Shoshone, Idaho, which these defendants do not admit, they say that the same is not the result of or a consequence of any of the mining or milling operations of the said defendants, or any of them, in the said county or elsewhere, and that, since the construction of said dams, it has been impossible for any débris or waste material from the mining and milling operations of the said defendants, or any of them, to escape or be carried unto the said Cœur d'Alene river; that, for a period of over 15 years prior to the commencement of this suit, the inhabitants of the towns and cities of the county

of Shoshone, Idaho, located along and contiguous to the south fork of the Cœur d'Alene river and its tributaries above the said lands claimed by the said complainants and their alleged associates, and each of them, have used the waters of the said south fork of the Cœur d'Alene river and its tributaries as a sewer, and into which waters the sewage from said towns and cities has, during said period of time, been dumped and emptied and thereby carried away, and that if, at any time mentioned in said bill of complaint, the waters of the said south fork of the Cœur d'Alene river or its tributaries, or the said Cœur d'Alene river, have become unfit for domestic uses and purposes, it is by reason of the fact of the dumping and emptying of said sewage into the waters thereof, and not by reason of any mining or milling operations of the said defendants, or any of them; that the mines, mills, and concentrators of the said defendants are situated in the mining region of the county of Shoshone, Idaho, known as "The Cœur d'Alene," having a population of over 12,000 inhabitants, producing about 40 per cent. of the lead mined in the United States, and annually a mineral product of lead and silver of about $13,000,000, estimated upon the New York quotations as afterwards stated; that the said inhabitants of said region are dependent for their employment, livelihood, and support, and all other business enterprises therein for their continuation, upon the unhampered and continued working, development, and operation by the defendants herein and others engaged in mining and milling in said district of their said mines, mills, and concentrators as they are at present and have been in the past; that the closing down of said mining and milling industries, and the prevention of the development, working, and operation as at present and heretofore of the said mines, mills, and concentrators of the defendants by the injunctive process of the court in this suit, would close not only all mines, mills, and concentractors of the defendants herein, but all other mines, mills, and concentrators in said region, destroy absolutely the business of mining and milling therein and all other business, cause a loss to the defendants herein alone of an invested capital of not less than twelve millions of dollars, and an actual loss of over twenty-five millions of dollars, and a loss to the said inhabitants of said region and other property owners therein of over fifty million dollars, retard the development of the natural resources of the state of Idaho, ruin mining, which is the chief industry and source of income of its people, destroy the value of millions of dollars of invested capital, suspend all other business enterprises, turn thousands of men out of employment, beggar their families, bankrupt said inhabitants and property owners, depopulate one of the largest producing and richest mining regions of the United States, and eliminate annually from the productive wealth of the United States thirteen million dollars; that the cutting off by the injunctive process of this court in this suit of the lead product of said region produced by said defendants from the lead market of the United States, and the elimination of said product therefrom, would result in the suspension of all lead smelting operations on the Pacific Slope, and seriously embarrass all other lead smelting in the United States; that the mines of said region produced during the year 1904, 217,365,165 pounds of metallic lead and 6,252,383 ounces of silver, of a value of $12,930,123.26, estimated upon the New York quotations, to wit, 57 cents per ounce of silver and 4.309 cents per pound for lead; that, of the said metallic product of said region during the year 1904, the said defendants produced 200,235,283 pounds of lead and 5,094,752 ounces of silver, of the value of $11,532,146.98; that mining in the state of Idaho is its chief and most important industry; that for the years 1903 and 1904 the mines of said region produced over 79 per cent. of the total mineral output of the state of Idaho; that the entire value of all wheat, oats, barley, rye, corn, flax, potatoes, and hay grown and produced in the state of Idaho for the year 1903 amounted to $15,181,194, only about $2,000,000 more than the mineral product of the said Cœur d'Alene region for the year 1904; that the mineral product in lead and silver of said Cœur d'Alene region for the year 1904, estimated upon the above quotation for lead and the coinage value of silver such as the government of the United States takes in estimating the value of the silver product of the United States, amounted to $17,459,970.93, or $2,278,776.93 more than the entire value of the wheat, oats, barley, rye, corn, flax, potatoes, and hay

grown and produced in the state of Idaho during the year 1903; that there are at the present time employed in said region in the said mining and milling industry therein 2,654 men, who are receiving an aggregate daily wage of $8,672.50, and an aggregate yearly wage of $3,165,462.50, and who would lose their said employment and wages by the suspension of the mining and milling operations in said region by the said injunctive process of this court in this suit, and that the property claimed by the complainants and their associates, and each of them, in said bill of complaint would thereupon have absolutely no value whatever; that, of the said men employed at the present time in said region in said mining and milling industries, 2,029 are employed by the defendants herein, to whom they pay an aggregate daily wage of $7,405.85, and an aggregate yearly wage of $2,703,135.25; that the said mines of the said defendants would have to be abandoned, and the working and development thereof discontinued, unless they are permitted to use the waters of the south fork of the Cœur d'Alene river and its tributaries in the mining, milling, concentration, and treatment of the ores extracted therefrom, in the same manner and with the same appliances already employed by them; that the mills and works of the said defendants are all equipped with the best and latest improved fixtures and machinery known to the ingenuity of man and the science of mining and milling for the lawful, safe, economical, healthful, and wholesome use of the said waters in their said respective mining and milling operations and the concentration and treatment of their said ores; that, at all times complained of by the complainants, the defendants, their grantors and predecessors in interest, had and held, by virtue of prior appropriation and ownership, the right to use the waters of the south fork of the Cœur d'Alene river and its tributaries in the mining, concentration, and treatment of their ores, and the ores of each of them, and the right to have the tailings and refuse matter arising from such works carried away by the waters of said streams, and that said right has become a vested one, and that the use of the waters, as aforesaid, of said stream is authorized and protected by the laws and Constitution of the state of Idaho, and that the said defendants and their grantors and predecessors in interest have used the waters of the said stream for said mining, milling, and concentrating purposes openly, notoriously, publicly, and continuously, and with the knowledge of said complainants and each of them, and of their said associates and each of them, and adversely to them and each of them and the whole world, for more than 16 years prior to the commencement of this suit, and that if said complainants or their associates, or any of them, have any rights in the premises, which these defendants deny, they are subject to the vested and accrued rights of said defendants and their grantors and predecessors in interest; that heretofore, and at a time when all the lands through which the south fork of the Cœur d'Alene river and its tributaries run were vacant, unoccupied, unclaimed, unsurveyed public lands of the United States, and at a time when the lands now claimed by the complainants and their associates, and each of them, in their said bill of complaint, were also a part of the vacant, unoccupied, unclaimed, unsurveyed public lands of the United States, the grantors and predecessors of the defendants in interest entered upon the said public lands and appropriated a part of the waters of the said south fork of the Cœur d'Alene river and its tributaries for the purpose of mining, treating, and concentrating the ores from the mines now belonging to said defendants and each of them, and which were then held by their grantors and predecessors in interest, and that, during all the time since such appropriation of said waters, the grantors and predecessors in interest of the defendants, and the defendants, have appropriated and used the waters of the said south fork of the Cœur d'Alene river and its tributaries in the mining, concentrating, and treatment of the ores from the mines of the said defendants; that the right to use said waters for the purposes aforesaid became, at the time of said appropriation, and ever since has been, and now is, a vested right, and at all times has been, and is now, recognized by the local customs, laws, and decisions of the courts, and that the alleged settlement of the complainants and their associates and their grantors and predecessors in interest, and each of them, if they ever made any settlement upon the lands mentioned in their said bill of complaint, or any of them, as well

as their alleged homestead claims allowed thereon, together with the patents issued therefor, were each and all subsequent and subject to the location of said mining claims and the appropriation and use of said waters as aforesaid; that said homestead claims allowed and patents granted therefor, each and all were subject to said vested and accrued water rights and the rights to the use of the said waters by the said defendants and their grantors and predecessors in interest; that if the said complainants, or any of them, or their associates, or any of them, have received a patent or patents from the United States for any of the lands claimed by them or any of them, which the defendants do not admit, there is contained therein a reservation and exception, which reservation and exception is in the words and figures as follows, to wit: "To have and to hold (the premises conveyed) subject to any vested and accrued water rights for mining agricultural, manufacturing or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws and decisions of courts;" that the rights of the said defendant to the use of the waters of the said south fork of the Cœur d'Alene river and its tributaries in the mining, concentration, and treatment of the ores from its mines, under said appropriation of said waters by the grantors and predecessors in interest of the said defendants, as aforesaid, is one of the vested rights reserved and excepted by said provision in said patent aforesaid; that it is the intention of the said defendants to conduct in the future their mining and milling operations in the most careful and painstaking manner, and to use the best and latest devices, machinery, appliances, and works in the same, and in the storage and impounding of said débris and waste material; that for more than 10 years prior to the commencement of this suit the said complainants and their associates, and each of them, knew that the said defendants and their grantors and predecessors in interest were operating their respective mines, and milling, concentrating, and treating the ores therefrom, in the same manner in which the said defendants are now operating their mines and treating, concentrating, and milling the ores therefrom, and that the said defendants and their grantors and predecessors in interest had expended in the construction of said mining plants, mills, and concentrators, and in the development of their respective mines, many millions of dollars, and were furnishing, and said defendants still are furnishing, employment to many thousands of men; that during all of said period of time said complainants and their associates, and each of them, stood by, acquiesced in, and permitted the said defendants, their grantors and predecessors in interest, to build up their large and expensive plants, mills, and concentrators, and develop their said mines at said enormous expenditure of money, without any protest or objection whatever until within a few months prior to the commencement of this suit, and up to within a few months prior to the commencement of this suit made no claim or demand whatever upon the said defendants, or any of them, nor did they, or either of them, excepting the said complainant Doty, as hereinbefore stated, take any action to assert or enforce their alleged claims or demands for equitable or any relief against said defendants, or any of them, on account of any of the acts, conduct, or doings on the part of the said defendants, or any of them, or on account of the acts or conduct of any of their grantors or predecessors in interest, or for any relief whatever relative to the matters or things complained of in the said bill of complaint, nor have the said complainants or their associates, or either or any of them, shown any excuse whatever on their part, or on the part of each of them, for their delay, and the delay of each of them, in asserting their alleged claims for the relief asked for in the said bill of complaint, nor for their long-continued acquiescence in the established and vested rights of the said defendants, and each of them, in the premises; that the said complainants and their associates are not, nor is either of them, entitled to any relief prayed for, for the reason that their alleged causes of action are barred by their laches, and the laches of each of them, in the respects set forth, and the defendants deny the unlawful combination set out in the bill, and pray that the suit be dismissed at the complainants' cost.

The record contains a large amount of testimony and a vast number of exhibits introduced in evidence on behalf of the respective parties, resulting up-

on final hearing in a judgment denying the injunction prayed for, with costs to the defendants.

William T. Stoll and W. C. Jones, for appellants.
C. W. Beale and Albert Allen, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

ROSS, Circuit Judge (after stating the facts as above). The extent and value of the mining operations of the appellees are not controverted, and it is practically conceded on behalf of the appellants that the granting of the injunction to which it is insisted they are entitled must necessarily result in closing those great operations in the Cœur d'Alene region, in the depopulation of that section of country, the destruction not only of the mining business there, but the business of the numerous towns that are shown by the record to be wholly dependent upon that industry, and the depriving of many of the farmers themselves in the valley of the Cœur d'Alene river of a market for their products. If the established principles of equity entitle the appellants to this drastic relief, it must, as a matter of course, be awarded them, however disastrous the consequences. But is the case made by the record such as to demand or even justify the injunction sought? It is very evident from the record that the exaggerations and misstatement of matters of fact is very gross. The briefs also disclose intense feeling on the part of the opposing counsel, which, perhaps, is not unnatural in view of all of the circumstances of the case and of the large interests involved. With this latter feature, however, we, of course, have nothing to do. The case itself is, like all such cases are, of very great importance, and calls for the exercise of the greatest care and caution in its consideration and disposition, lest the weak be not afforded the protection to which they may be justly entitled, and, on the other hand, lest the strong be denied their just rights, acquired in the pursuit of enterprises not only lawful in themselves, but sanctioned and encouraged by both national and state legislation, and redounding to the great good of thousands of people and to the country as a whole. The testimony and exhibits are altogether too voluminous to permit of a specific review of them in an opinion of reasonable length, so we shall confine ourselves to a brief statement of the principles by which we are guided, and of the grounds upon which we rest our judgment.

In all of the mining states the right to the reasonable use of the public streams for mining purposes is given by usage, custom and law, and by section 3 of article 15 of the Constitution of the state of Idaho, where the properties here in question are situate, miners are given the preferred right to the use of the waters of the streams of that state over, among others, manufacturers and agriculturists. Such right, however, is not unlimited, and does not carry with it the right to destroy the property of any other person. In other words, the maxim, "Sic utere tuo ut alienum non lædas," applies to such a case, and in all cases where the property of any one is injured by such unreasonable use of such a stream the injured party has the absolute and unqualified

right to maintain an action for the damages sustained. And, in this very instance, the record before us affirmatively shows that, prior to the institution of the present suit, the appellant Doty, in behalf of himself and his alleged associates, did bring actions at law against the appellees for the recovery of damages for the same alleged wrongful acts here complained of, which law actions were pending at the time of the bringing of the present suit, and presumably are still pending.

To an injunction, however, even on final hearing, no one has an absolute and unqualified right. Such an application appeals to the conscience of the chancellor, to the exercise of a wise and sound discretion, and should be granted or witheld according to the equities of the case as made to appear by the record. Each case must be considered and made to depend upon its own particular facts and circumstances, in the consideration and determination of which the general rules governing courts of equity are to be borne in mind and applied. Among those rules is the well-established one that an appellate court will not ordinarily interfere with the action of the trial court in either granting or withholding an injunction in cases in which the evidence is substantially conflicting, and especially where the trial judge, at the request of the respective parties, has had the benefit of a personal inspection of the premises. Nor should an injunction be granted in any case where it will necessarily operate contrary to the real justice of the case. Furthermore, where, as in the present case, it is sought to enjoin a lawful business, the court should give due consideration to the comparative injury which will result from the granting or refusal of the injunction sought. We so held in the case of Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621, and the Supreme Court of the United States has so held in several cases, and in three very recent and very important ones. Especially where, as appears by the record before us, the appellants have pending against the appellees actions at law, previously commenced, to recover damages for the same alleged acts, should a court of equity be very slow to stop the vast operations here in question, thereby throwing out of employment thousands of men, practically wiping out of existence important towns, ruining a large number of business men, destroying markets for the crops of many farms, and where the business in and of itself is not only not unlawful, but, by the Constitution of the state in which all of the properties in question are situate, is expressly given the preferred right over the great industry of agriculture itself, and where, by Congressional legislation as well as by usage, custom, and laws in all of the mining states and territories, it is sanctioned and encouraged. Especially, too, should a court of equity be very slow to grant such an injunction, with the necessary consequences stated, in advance of a trial of the law actions for damages already brought and pending, and where, as here, the appellees deny the existence of the facts upon which the conclusion that a nuisance exists are based, where the evidence is very conflicting, and where it is most difficult to ascertain the exact truth as between the conflicting statements. Every presumption must, of course, be indulged that the appellants will receive justice in the court in which they have brought their

actions at law for damages, and in which actions the appellees may avail themselves of a jury trial upon the question of the existence of the alleged nuisance, as well as upon the question of the alleged damages. In the case of Parker v. Winnipisogee Lake & Woolen Co., 67 U. S. 545, 552, 553, 17 L. Ed. 333, the Supreme Court said:

"Where an injunction is granted without a trial at law, it is usually upon the principle of preserving the property until a trial at law can be had. A strong prima facie case of right must be shown, and there must have been no improper delay. The court will consider all the circumstances and exercise a careful discretion. * * * After the right has been established at law, a court of chancery will not as of course interpose by injunction. It will consider all the circumstances, the consequences of such action, and the real equity of the case."

If, as there expressly held by the Supreme Court, and as we have heretofore said, a court of equity will consider all the circumstances, the consequences of injunction and the real equity of the case, even after a right has been established at law, a fortiori will such a court consider all of those matters where the action at law has been commenced but not tried.

In the cases of New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956, and Georgia v. Tennessee Copper Co., 206 U. S. 230, 27 Sup. Ct. 618, 51 L. Ed. 1038, the Supreme Court also held that one has not the absolute and unqualified right to an injunction even on final hearing. In the case of New York City v. Pine, the plaintiff claimed the right to enjoin the city from building a dam and diverting the waters of a certain stream that flowed through their farms in the state of Connecticut. The Supreme Court, for the purpose of its decision, assumed, among other things, that the plaintiffs had the legal right to such flow of the waters of the stream, but notwithstanding that, among other assumptions, it held that the plaintiffs were not entitled to the perpetual injunction awarded by the lower court; saying:

"This is not a case between two individuals in which is involved simply the pecuniary interests of the respective parties. On the one side are two individuals claiming that their property rights are infringed—rights which can be measured in money, and that not a large sum; on the other, a municipality undertaking a large work with a view of supplying many of its citizens with one of the necessities of life. According to the averments in the bill, the city had been engaged in this work for two years, and had nearly completed the dam. While the near completion is denied in the answer, there is no denial of the time during which the city had been engaged in the work, and it stands as an admitted fact that for two years prior to the commencement of this suit the work had been under way. It is true the testimony discloses that the plaintiffs and the city had been trying to agree upon the amount of compensation for the injuries they would sustain, and were not insisting upon their alleged right to an abandonment of the work. It is one thing to state a right and proffer a waiver thereof for compensation, and an entirely different thing to state the same right and demand that it should be respected. In the latter case the defendant acts at his peril. In the former he may well assume that payment of a just compensation will be accepted in lieu of the right. In the latter the plaintiff holds out the single question of the validity and extent of the right; in the former he presents the right as the foundation of a claim for compensation, and his threat to enforce the right if compensation is not made is simply a club to compel payment of the sum he deems the measure of his damages. Further, the testimony shows that

the city was settling with other parties similarly situated, and paying out large sums of money for the damages such parties would sustain. So it is not strange that the city acted on the assumption that the only matter to be determined was the amount of the compensation.

"If the plaintiffs had intended to insist upon the strict legal rights (which for the purposes of this case we assume they possessed), they should have commenced at once, and before the city had gone to expense, to restrain any work by it. It would be inequitable to permit them to carry on negotiations with a view to compensation until the city had gone to such great expense, and then, failing to agree upon the compensation, fall back upon the alleged absolute right to prevent the work. If they had intended to rest upon such right and had commenced proceedings at once, the city might have concluded to abandon the proposed undertaking and seek its water supplies in some other direction. If this injunction is permitted to stand, the city must pay whatever the plaintiffs see fit to demand, however extortionate that demand may be, or else abandon the work and lose the money it has expended. While we do not mean to intimate that the plaintiffs would make an extortionate demand, we do hold that equity will not place them in a position where they can enforce one."

In a case between two sovereign states—Kansas and Colorado—in which circumstances the court held, in effect, in the case of Georgia v. Tennessee Copper Co., 206 U. S. 230, 27 Sup. Ct. 618, 51 L. Ed. 1038, that it was less willing to balance harm than in cases between private individuals, it nevertheless distinctly held in Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956, as will be seen from its summing up on page 117 of 206 U. S., on page 675 of 27 Sup. Ct. (51 L. Ed. 956), that the diversion of the waters of the Arkansas river in Colorado, resulting in great good to that state, was of perceptible injury to portions of the Arkansas valley in Kansas, particularly those portions closest to the Colorado line, but that to the great body of the valley it had worked little, if any, detriment; and, in view of those facts, the court held upon final hearing that it was not satisfied that Kansas had made out a case entitling it to a decree. At the same time it held it to be obvious that, if the depletion of the waters of the river by Colorado continues to increase, there might come a time when Kansas would be entitled to an injunction; so, in dismissing the bill of complaint, it did so "without prejudice to the right of the plaintiff to institute new proceedings whenever it shall appear that, through a material increase in the depletion of the waters of the Arkansas river by Colorado, its corporation or citizens or substantial interests of Kansas are being injured to the extent of destroying the equitable apportionment of benefits between the two states resulting from the flow of the river."

And the same court expressly declared the same principle in the case of Georgia v. Tennessee Copper Co., 206 U. S. 230, 27 Sup. Ct. 618, 51 L. Ed. 1038. See principal and concurring opinions, pages 238, 240, of 206 U. S., pages 619, 620, of 27 Sup. Ct. (51 L. Ed. 1038).

The record in the case before us shows that upon all of the material facts undertaken to be shown by the complainants there not only appears to be a very substantial conflict in the proofs, but, in some respects at least, the preponderance of the evidence seems to be largely in favor of the defendants. Take, for instance, the claim on the part of the complainants of the death of some of the complainants' stock by reason of drinking the waters of the river. The number of wit-

nesses who testified on behalf of the defendants to the effect that the complainant's stock did not die by reason of mineral poison in the waters of the river (and whose testimony, so far as we can know, is entitled to as much credence as the complainants' witnesses) are not only greater in number, but their testimony to the effect that there were similar deaths of stock in the bottom lands of other rivers in Idaho, as well as along a river in British Columbia where there was no mining, is suggestive and confirmatory of the contention upon that point upon the part of the defendants. But what seems to be quite conclusive upon that point is the uncontradicted testimony in the record to the effect that ever since the establishment of the mines and mining towns along the branches of the Cœur d'Alene river, and nearer to the mills and works of the appellees, animals of all kinds—dairy cows, horses, and dogs—as well as people, have regularly drunk the waters of the river, and that in no single instance was there ever a death from mineral poison. Then, too, the testimony seems to decidedly preponderate in favor of the defendants upon the proposition that there has been no such general and serious damage to the agricultural lands of the valley as is claimed on the part of the complainants, and, indeed, excepting a few and very restricted areas, no damage at all. That seems to be indicated by a strong preponderance of the testimony to the effect that, excepting in comparatively narrow and restricted strips along a few of the ditches or gulleys through the lands of a few of the complainants, no lead or zinc was found in the numerous analysis made of the lands that were periodically overflowed by the river, and, by what seems to be pretty well established, that the crops of the valley in the year 1905, after the last freshet, never were so good before, and by the numerous photographs of the various ranches in the valley, which, so far from indicating any serious damage, show an unusual and vigorous growth of crops of various kinds. It is true that photographs are not very reliable, since the camera may be so placed as to give a deceptive impression. Still, in view of the large number of photographs and the general character of the crops and growth indicated by them, they are in some respects confirmatory of the contentions on the part of the appellees. The facts stated by the trial judge in his opinion in the case, especially in view of his personal inspection of the premises, made at the request of the respective parties, are, we think, entitled to great weight. From his findings, and also from the testimony introduced, it seems clear that the allegations and contentions on the part of the appellants to the effect that the operations of the appellees have resulted in interfering with the navigation of the river are entirely unfounded.

Upon the record before us we hold that the court below should have dismissed the bill of complaint at the cost of the complainants, without prejudice, however, to any other or further suit of the complainants, or either of them, in the event that any other or further injury than is here shown shall be shown to have been sustained by them, or either of them, and, of course, without prejudice to any action or actions for damages actually sustained by them or either of them. The

case is remanded to the court below with directions to modify the judgment as indicated, and, as so modified, it will stand affirmed.

In view of the very important principles and of the large interests involved, it is further ordered that our mandate be stayed for 90 days in order to afford the aggrieved parties an opportunity to apply to the Supreme Court for a writ of certiorari, in the event they shall so desire.