[No. 16103.  *En Banc.*  June 1, 1921.]

## J. H. PRICE *et al., Appellants,* v. HUMPTULIPS DRIVING COMPANY *et al., Respondents.*[1]

WATERS AND WATER COURSES (58)—PRESCRIPTION—ADVERSE CHARACTER OF APPROPRIATION. The filing by a public service corporation with the secretary of state of the plat and notice required by law showing that it was organized for the purpose of driving logs in a certain river was not sufficient to initiate an adverse claim or assertion of a legal right necessary to the support of prescriptive title.

INJUNCTION (10, 11, 43)—DEFENSES—LACHES—INCONVENIENCE TO PUBLIC. Where plaintiffs acquiesced for a long series of years in the use by a public service corporation of splash dams to produce artificial freshets, the plaintiffs themselves making use of the freshets for the same purpose, and having knowledge that such use of the stream caused erosion of their lands, their application to enjoin further use of the stream by defendant should be denied, since injunctive relief would cause serious public inconvenience and loss without corresponding advantage to plaintiffs.

Appeal from a judgment of the superior court for Grays Harbor county, Hewen, J., entered July 24, 1920, upon findings in favor of the defendants, in an action to enjoin the creation of artificial freshets in a river. Affirmed.

*W. H. Abel, E. E. Boner,* and *M. J. Gordon,* for appellants.

*Theodore B. Bruener* and *John T. Welsh,* for respondents.

MACKINTOSH, J.—This is an action in equity wherein the plaintiffs seek to enjoin the defendants from creating artificial freshets in the Humptulips river, and to prevent the change of the channel of that river and to restrain the defendants from trespassing upon plain-

[1]Reported in 198 Pac. 374.

tiffs' lands which abut upon that river. The defendants claim the right to create the artificial freshets and to do the acts complained of, based upon prescription.

The Humptulips river rises in the Olympic mountains and, by a tortuous channel through heavily timbered country, reaches Grays Harbor. The Humptulips is a meandered stream and, in its natural state, was floatable for logs. In 1900, the defendant incorporated as a public service corporation for the purpose of driving logs down the Humptulips river, past and through the lands involved in this proceeding. Within the statutory time, it filed in the office of the secretary of state the required plat and notice. In 1903, it had finished a splash dam on one of the branches of the river several miles above the plaintiffs' land. This dam has been continuously used since that time. In 1907, another splash dam was completed upon the other branch of the river also several miles above the plaintiffs' property, and likewise this dam has been in continuous operation since its completion. By means of these two dams, the waters of the river were impounded and artificial freshets were created to assist in driving logs down the river. These artificial freshets have added to the natural erosion created by the current and have caused the river to encroach upon the plaintiffs' adjacent land. The defendant, since 1900, has been upon the river, improving the channel, straightening its course, removing rocks and obstructions, and doing other things necessary to facilitate the driving of logs, and in doing this has gone upon the banks of the river and has used donkey engines thereon for the purpose of sacking logs. All these things were necessary to the successful driving of the stream, and have been done for more than ten years prior to the commencement of this suit.

The property in question here, prior to 1912, has been owned for many years by the Lytle Logging and Mercantile Company. In 1904, 1905 and 1906, this company logged into the river and consented to the defendant entering upon its lands, sacking logs and creating artificial freshets and changing the channel. In 1912, the Lytle Logging and Mercantile Company sold the property to the intervener, Walker Timber Company, which was also engaged in logging, and which continued to consent to the use made of the land by the driving company, and the creation of artificial freshets, and this permission was never withdrawn until shortly before this action was instituted. In October, 1919, the intervener contracted to sell the property to the plaintiffs, who, in November, 1919, started this suit.

The trial court denied the injunction on the ground that the defendant is a public service corporation, performing a public function, and that it had taken the lands of the plaintiffs for its corporate purposes, and that the taking had been complete for many years, and therefore the plaintiffs were not entitled to equitable relief. The court also found against the defendant's claim of prescriptive easement.

Without a minute or detailed review of the testimony upon which the lower court came to the conclusion concerning the use of the plaintiffs' land by the defendant's employees and machinery, and the encroachment upon the banks by the additional erosion caused by the artificial freshets, it is enough to say that a consideration of the testimony satisfies us that the trial court arrived at a proper conclusion and was correct in holding that the defendant's claim of prescriptive right could not be sustained. The testimony satisfies us that the acts done by the defendant were done with the permission and the active acquiescence of the plaintiffs

and their predecessors in interest; several written documents appear in the testimony which fortify this conclusion, and, with the trial court, we also agree in holding that the filing of the plat and notice with the secretary of state, as required by law, did not initiate an adverse claim, nor was it the assertion of a legal right which is necessary to support a prescriptive title. Article 1, § 16, of the state constitution, prevents such filing from having the effect claimed for it by the defendant. As was said by this court in *Peterson v. Smith*, 6 Wash. 163, 32 Pac. 1050:

"The land owner need do nothing before his property has been condemned by a municipal or public service corporation."

See, also, *State ex rel. Smith v. Superior Court*, 26 Wash. 278, 66 Pac. 385; *Nicomen Boom Company v. North Shore etc. Co.*, 40 Wash. 315, 82 Pac. 412.

The filing of the notice and plat gave the defendant only the prior right of location on this stream for driving and booming purposes, and did not start the statute of limitations running against the plaintiffs or their predecessors or initiate any right in hostility to their title.

We do not agree, however, with the trial court in holding that this case falls within the operation of the rule announced where public service corporations, having taken possession of private property and constructed thereon improvements to be used in carrying on of public service, have been allowed to continue in the use of the property, and the property owner has been denied injunctive relief and the corporation has been compelled to proceed to condemn. *Kakeldy v. Columbia & Puget Sound R. Co.*, 37 Wash. 675, 80 Pac. 205; *Domrese v. Roslyn*, 89 Wash. 106, 154 Pac. 140; *Habermann v. Ellensburg etc. Co.*, 100 Wash. 229, 170 Pac. 571; *Irwin*

*v. J. K. Lumber Company,* 102 Wash. 99, 172 Pac. 911. The acts sought to be enjoined by this suit are not acts of taking which have already occurred, but acts which are likely to occur by the continued operation of the defendant. In other words, the plaintiffs are not seeking to enjoin the defendant from the use of the property which it has already taken without condemnation, but is seeking to enjoin the future infliction of damages. The plaintiffs are not in the position of the plaintiffs in the cases just above cited, but are in the position of those who, seeing a public service corporation about to enter upon their property, seek to enjoin the corporation before it has taken possession. Although, upon the legal principles which we have thus discussed, we are in agreement with the plaintiffs' contention, we cannot agree that they are entitled to the relief which they seek. The granting of equitable relief is not a matter of right but of grace, and before plaintiffs are entitled to the favorable decree of equity there must be justice in their claim. After the plaintiffs and their predecessors have acquiesced in the conduct of the defendant and public interest will be jeopardized by granting the relief prayed for, and such a grant would cause serious public inconvenience or loss without a corresponding advantage of the plaintiffs, the chancery court will not enjoin. Where, under mutual agreement, the plaintiffs, knowing all the facts, having long delayed in entering the portals of the equitable tribunal, and that delay has been without good excuse, the doors are closed against them, for to allow them at this time to enter would result in greater damage to the defendants than that which the plaintiffs would suffer.

Here we have a situation where for twenty years the plaintiffs and their predecessors had notice that the defendant was using the stream in the exercise of its

public service functions, where for more than sixteen years they have observed the use of their lands by the defendant, and the erosion thereof by the artificial freshets, and not only have they stood by in silence, but they have actively participated in the enterprise. It was to their advantage that the streams and the contiguous banks be so used. They have taken the benefit of the operations of the defendant for the purposes of getting their timber to market, they have been, in effect, joint adventurers with the defendant in the opening up of this timber area. Not until they had reaped the benefits of this association do we find them objecting to the operation. Their conduct does not appeal to the conscience of the chancellor. By their own pleadings and proof, they established that all the acts heretofore done have been with their permission, and by these pleadings and proof they defeat the defendant's claim of a prescriptive right, and by these same pleadings and proof they establish the inequity of their own position. In 1903, the defendant built the first dam, and the second in 1907. Both of these entailed the expenditure of large sums of money, both have been operated continuously since their construction; large sums of money have also been expended in straightening the river, in removing obstructions and similar work. The plaintiffs' predecessors have consigned their logs to the defendant, conscious that their own lands were being eroded by the artificial freshets and that the Humptulips river was being devoted to a public purpose. During that time the plaintiffs' predecessors often requested additional artificial freshets, so that their logs might be more quickly brought to market. The logs of many other landowners on the river were and are being consigned to the defendant. To now enjoin the defendant would result in shutting

down of many logging camps, the discontinuance of the employment of many men, thousands of logs in the river would be kept from market, milling companies would be hampered by lack of logs, and public interest demands that no such untoward results be allowed for the benefit of one who, after all these years of acquiescence and knowledge and benefits received, now seeks the termination of this condition.

In 1909, the Lytle Logging & Mercantile Company, in an action against the defendant, reported in 60 Wash. 559, 111 Pac. 774, sought damages for changing the course of the river across a portion of the land involved in this suit. That action, by its complaint, sought damages for future as well as past erosions to the portion of the land, but the judgment does not disclose whether future erosions were compensated for. If they were, the plaintiffs, of course, cannot again recover for them, and all the lands affected should have been included in that action. *Kline v. Stein*, 46 Wash. 546, 90 Pac. 1041, 123 Am. St. 940; *Collins v. Gleason*, 47 Wash. 62, 91 Pac. 566, 125 Am. St. 891; *Brechlin v. Night Hawk Mining Co.*, 49 Wash. 198, 94 Pac. 928, 126 Am. St. 863. In any event, having then elected to proceed at law, and the use of the river being the same now as it was at the time the suit was begun in 1909, it would be inequitable to now compel the defendant to stop its continued use.

As the trial court said: "the large cost of defendant's dams, large quantities of logs in the river requiring immediate transmission, are elements which the court should consider in granting or refusing an injunction. While the holding is that the action of the defendant had been by sufferance, nevertheless, the plaintiffs have endured the same for a long period and should not now be allowed to peremptorily interrupt

the business of the defendant driving company at this time by injunction.'' *Mahoney Land Co. v. Cayuga Investment Co.,* 88 Wash. 529, 153 Pac. 308; *Robertson v. Seattle,* 37 Wash. 137, 79 Pac. 610.

''The equitable doctrine of acquiescence is freely applied to cases involving eminent domain rights. The underlying principle of the constitutional provisions allowing the taking of private property is that it is to be devoted to public use. Hence, when a landowner stands by until the public has acquired an interest in the use, there is strong reason for applying the doctrine, in addition to the familiar grounds covering its application to other cases. The United States supreme court in a recent case has laid down the rule in no uncertain language: 'If one, aware of the situation, believes he has certain legal rights, and desires to insist upon them, he should do so promptly. If by his declarations or conduct he leads the other party to believe that he does not propose to rest upon such rights, but is willing to waive them for a just compensation, and the other party proceeds at great expense in the expectation that payment of a fair compensation will be accepted and the right waived—especially if it is in respect to a matter which will largely affect the public convenience and welfare—a court of equity may properly refuse to enforce those rights, and, in the absence of an agreement for compensation, compel him to submit the determination of the amount thereof to an impartial tribunal.' Accordingly, when a landowner stands by and makes no attempt to enjoin a railroad company from building over his land until large expenditures have been made, or the road has been completed, injunctive relief will be denied, and the party will be left to his remedy at law for damages. The same principle applies to the laying of pipes or to a taking for any other public use. And although permission is granted to take upon the distinct understanding that compensation is to be made, an injunction will not issue, after the work has been done, for the purpose of enforcing payment. The doctrine also applies to cases

involving the rights of railroads in streets." Vol. V, Pomeroy's Equity Jurisprudence, § 1886.

See, also, *McCarthy v. Bunker Hill etc. Co.*, 164 Fed. 927; 22 Cyc. 778, 784; *Hardin v. Olympic Portland Cement Co.*, 89 Wash. 320, 154 Pac. 450; *Woodard v. West Side Mill Co.*, 43 Wash. 308, 86 Pac. 579.

"An injunction is an extraordinary remedy, and does not follow as of right even when a case of wrongful act is made out on one side and consequent injury on the other. In equity a decree is of grace rather than of right, and the court will always consider whether it will not do a greater injury by enjoining an act than would result from permitting the act to continue and leaving the party injured to his remedy in damages." *Ferry-Leary Land Co. v. Holt & Jeffery*, 53 Wash. 584, 102 Pac. 445.

For the reason that we find no equity in the plaintiffs' action, it is dismissed. The judgment of the lower court is affirmed.

PARKER, C. J., FULLERTON, TOLMAN, MITCHELL, and MAIN, JJ., concur.

BRIDGES, J., took no part.