NORTH FORK WATER CO. v. MEDLAND et al.

(Circuit Court, S. D. California, S. D. March 13, 1911.)

No. 868.

1. INJUNCTION (§ 1*)—RIGHT TO RELIEF.

Injunction is not a matter of absolute right.

[Ed. Note.—For other cases. see Injunction, Dec. Dig. § 1.*]

2. ACTION (§ 1*)—INJUNCTION (§ 59*)—SPECIFIC PERFORMANCE (§ 8*)—BREACH—REMEDIES.

One has an absolute right to sue at law for damages sustained through breach of contract; but equitable relief, such as injunction or specific performance, is discretionary with the chancellor.

[Ed. Note.—For other cases. see Action, Cent. Dig. §§ 1–9; Dec. Dig. § 1;* Injunction, Cent. Dig. §§ 114–116; Dec. Dig. § 59;* Specific Performance, Cent. Dig. §§ 17, 18; Dec. Dig. § 8.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. WATERS AND WATER COURSES (§ 254*)—IRRIGATION—CONTRACTS—PRACTICAL CONSTRUCTION—ESTOPPEL.

Thirteen years acquiescence in practical construction given a contract to supply water for irrigation estops a consuming company to claim a larger quantity than has been furnished, especially where large and flourishing communities have been built up at great expense under such construction.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 254.*]

4. WATERS AND WATER COURSES (§ 132*)—APPROPRIATION—ESSENTIALS.

The most essential element of an appropriation of water is application to a beneficial purpose.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 132.*]

5. WATERS AND WATER COURSES (§ 254*)—IRRIGATION CONTRACTS—CONSTRUCTION—QUANTITY TO BE SUPPLIED.

To secure a definite water supply, ditch owners entitled to one-half the waters of a stream contracted with an irrigation company that surplus waters might be disposed of by the company. The contract provided that substantially one-half of all water taken from the stream, aside from that supplied from the company's reservoir, should flow into the ditch. *Held* that, if the contract was intended to require one-half of the water of the river to be put into the ditch regardless of its beneficial use by others and of its use by the ditch owners, the last-mentioned provision is invalid; neither probable future need of that quantity by the ditch owners nor porous character of the ditch resulting in seepage loss constituting ground to sustain such provision.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 254.*]

6. WATERS AND WATER COURSES (§ 247*)—INJUNCTION—RIGHT TO RELIEF—BREACH OF CONTRACT.

An irrigation company's failure to divert part of its own water through complainant's ditch under a contract whereby surplus waters were granted to the company to secure a definite supply to complainant and others does not warrant injunctive relief.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 247.*]

In Equity. Bill by the North Fork Water Company against William Medland, receiver of the Bear Valley Irrigation Company, and others. Bill dismissed.

H. Goodcell and Byron Waters, for complainant.

Hunsaker & Britt, for defendants.

J. A. Gibson, for interveners.

ROSS, Circuit Judge. The contract upon which this suit is based was entered into in writing between the complainant and a predecessor in interest of the Bear Valley Irrigation Company on the 23d day of May, 1885. The suit was not instituted until April, 1898, and was permitted by the parties to slumber and drag along until about two months ago, when it was brought up for the consideration and decision of the court. At that time it was argued orally by counsel for the respective parties, and since then briefs on their behalf have been filed, all of which, as well as the record, have had careful consideration. I shall not undertake to do more than to state generally the grounds upon which the court rests its decision.

The record shows that up to the time of the making of the contract, and for a number of years prior thereto, the upper waters of the Santa Ana river had been about equally divided between the people living on the north and south sides of the river, respectively; the complainant and its predecessors in interest and others living on the north side appropriating one half of such waters by means of an open earthen ditch (subsequently and prior to the execution of the contract partly cemented) called the North Fork ditch, and those on the south side, the other half, by means of a similar ditch called the South Fork ditch; the point of division being near the mouth of the Santa Ana canyon at a place called in the record the "Divide." Bear creek was the principal tributary of the river, and across that creek the Bear Valley Land & Water Company, a corporation, commenced the erection of a huge and costly dam for the purpose of impounding the natural flow of Bear creek, as well as the rains of winter; its purpose being to supply water for domestic and irrigation purposes.

The conditions and negotiations leading up to the contract upon which the suit is based are thus stated by the counsel for the complainant:

"At the time of the incorporation of the North Fork Water Company, the Bear Valley dam, to impound water in the Bear Valley reservoir, was in course of construction. It promised serious complications between the Bear Valley Company and the users of water through the North Fork and the South Fork ditches; for not only would the dam, when closed, intercept the flow of Bear creek, the main tributary of the river, and thus at times deprive those users of some water to which they had prior right, but the water of the reservoir was to be carried down the creek and river, mingled with the natural flow, and the division of water, as between the reservoir and the natural flow, would surely be a source of controversy and trouble. The natural flow of the river, as is the case with all our mountain streams, would be a fluctuating quantity, varying not only in different years, but in different seasons of the same year, and even in different hours of the same day, and the water that would be desired to be taken from the reservoir would also be a variable quantity. To make even an approximately exact division of the water at the mouth of the canyon some 20 miles from the reservoir would be extremely difficult, and to make a division that would be acceptable to all concerned would be practically impossible. It was important to all parties, and imperative to the Bear Valley Company, that some mode of operation should be agreed upon. And it was natural that at this juncture the unorganized North Fork users should seek concert of action among themselves through incorporation. Accordingly negotiations for an agreement were opened, which continued several weeks. The Bear Valley Company, through the control it would have of a reserve of water in the reservoir, could offer a most valuable inducement to the water users—a guaranty of a supplemental supply from the reservoir at times when the river should be low. It offered to guarantee the delivery of a certain and fixed flow of water during six months of the year, covering the ordinary irrigating season, and the period subject to deficiency from the natural flow, and it supplemented this by an offer to bear one-half of the cost of completing the cementing of the ditch, so that the quantity to be so delivered into the ditch should reach the place of use with comparatively little loss, upon the consideration that these users should surrender all claim to water, in excess of the stated quantity, during those six months, and that during the remaining six months—the so-called winter months, when the supply was usually abundant, and when a deficiency would never be extreme or disastrous—they should be entitled to receive only one-fourth (instead of one-half) of the natural flow of the river, it being contemplated that no water would be drawn or needed from the reservoir during these six winter months, and hence the division of the flow would present no difficulty. This, though acceptable as the basis of an agreement, did not sat-

isfy the north side users. They had been accustomed for many years to have the water of the river divided at a certain point, and to have one-half of it diverted to the north side; and there were reasons why they should desire such division and diversion to be continued, unchanged in place and quantity. The reservoir was an experiment, yet to be tested. It might fail from the breaking of the dam or other cause; and years might elapse before it would be restored, or it might never be restored. In case of the failure of the reservoirs, temporarily or permanently, it was important to be secure of (in) a reversion to their old right of one-half of the natural flow of the river. If in the meantime, however, more than the one-half should be diverted elsewhere, or the point of division or diversion should be materially changed, then, in case of failure of the reservoir, it might be difficult, perhaps impossible, to revert to the old use to its full extent. Their old right might be greatly curtailed by accruing adverse rights of other users in other places. Besides, though the quantity of water agreed to be secured as of right to the owners of interests in the North Fork ditch, especially in connection with the proposed cementing of the ditch, would be ample for the then needs of such users, they realized that with the growth of settlement and cultivation the time would come when more water would be needed on the north side and probably by themselves. They were insistent, therefore, upon retaining on the north side the full one-half of the natural flow of the river in addition to what they might receive as a supplemental supply from the reservoir; and, as testified by some of the witnesses, no agreement would be accepted by the north side without such provision. Finally," continues the brief, "the contract sued on was executed, being signed by the Bear Valley Land & Water Company as party of the first part, and by the then appropriators and users of the water of the river on the north side thereof, including the North Fork Water Company, as parties of the second part. Omitting such parts as have no bearing upon the questions in the present suit, the contract is as follows:

" 'Whereas, parties of the second part are desirous of making an arrangement with the party of the first part whereby the supply of water available to said parties of the second part may be made certain and secure during the months of June, July, August, September, October, and November, and are further desirous of increasing the present capacity of the said North Fork ditch and completing the construction of the same. Now therefore, know all men by these presents:

" 'I. Parties of the second part agree that all of their respective water, water rights and interests over and above the amount or quantity herein stipulated to be furnished and allowed to or retained by the parties of the second part, may be perpetually held and enjoyed by the party of the first part for its use, benefit and disposal, subject to the terms and conditions of this agreement and except as herein limited. * * *

" 'II. The parties of the first part agree to furnish and deliver to parties of the second part continuously, during the following named months of each and every year hereafter, the number of inches of water under a four inch pressure, hereinafter next mentioned as allotted to each of said months, respectively, to wit: June, five hundred (500) inches; July, six hundred (600) inches; August, six hundred (600) inches; September, five hundred and fifty (550) inches; October, four hundred and fifty (450) inches; November, four hundred (400) inches. * * *

" 'III. It is understood and agreed that during the months of December, January, February, March, April, and May one-fourth of all the water flowing in the Santa Ana river at the point known as the "Divide" (exclusive of water placed therein by parties of the first part), being the place where the waters of the North Fork and South Fork ditch, so called, are divided, shall belong and be delivered to parties of the second part by parties of the first part. It being further understood and agreed that the surplus of all waters so apportioned to parties of the second part which is not required or desired to be used by parties of the second part may be used by the party of the first part always; provided, however, that parties of the second part shall be the sole judges of whether such surplus water is or is not required by them. All waste water at the end of the said North Fork ditch shall belong to the party of the first part.

"'IV. It is further understood and agreed that in the event of there being upward of thirteen hundred (1,300) inches of water in the said Santa Ana river at the point of the "Divide" aforesaid, in its natural flow, exclusive of the water therein placed by act of party of first part during the month of June of any year, then one-half of the surplus of said water shall belong and be delivered by party of first part to parties of second part; and the division and allotment of said surplus shall in no way affect or control the allotment, of waste hereinbefore specified under caption II, hereof, and shall be considered as, and be wholly independent thereof.

"'V. All division and allotment' of water under the agreement as between party of first part and parties of second part shall be measured and made at the point on the Santa Ana canyon or river hereinbefore referred to and known as the "Divide."

"'VI. Parties of the second part agree, within two years from the date hereof, to complete the ditch of the North Fork Water Company, by enlarging the same where not already paved and cemented, and where not already of such capacity to a size sufficient to carry fifteen hundred (1,500) inches of water and by substantially cementing and paving such portions so to be enlarged as aforesaid, and to pay one-half of the expenses of such enlargement, paving and cementing, together with one-half of the expense of maintaining said ditch when completed as aforesaid, and said party of the first part hereby agrees to pay the other half of said expenses.

"'VII. On the execution of this agreement, party of the first part agrees to pay to parties of the second part, the sum of two thousand dollars ($2,000), and on the 1st day of January, 1886, the further sum of two thousand dollars ($2,000), as a consideration for the one-half interest in the said North Fork ditch herein mentioned. By the North Fork ditch is meant the main ditch commencing at or near the "Divide" aforementioned and extending to Haven corner, and as described in articles of incorporation of North Fork Ditch Company.

"'VIII. It is further understood and agreed that until said ditch shall be enlarged to a capacity of fifteen hundred inches as hereinbefore stated, no greater amount of water shall be allowed to flow into or through said ditch by party of the first part than twelve hundred inches without the written consent of a majority of the water interest of parties of the second part.

"'IX. The capacity of said ditch may be at any time hereafter increased beyond said fifteen hundred inches by either party of the first part or parties of the second part; in which event the expense of said enlargement may be borne in equal proportions by the parties hereto, and in that event said parties shall be entitled to share equally in the use and enjoyment of said increased capacity. In the event, however, that either of the parties hereto should fail or refuse to unite with the other of said parties in effecting said increase of capacity or in promptly paying one-half of the expenses of making the same, then and in that case the party so failing or refusing, shall not be entitled to the use or enjoyment of said increased capacity, or to any of the benefits thereof.

"'X. It is understood and agreed that substantially one-half of all water taken from the Santa Ana river, aside from that which may be supplied from the Bear Valley Reservoir, shall at all times flow in said North Fork ditch.

"'XI. It is further understood and agreed that the party of the first part shall be under no obligation to furnish water to parties of the second part, as hereinbefore provided, until on and after June 1st, 1886, and that until said date all the water of said river which parties of the second part have used, or to which they have been entitled prior to the date hereof, shall be used as heretofore, and in the same proportions irrespective of the allotments mentioned under this agreement.

"'XII. Each individual of the parties of the second part agrees for himself and itself and his and its successors in interest, respectively, to contribute and pay the portion of the expenses necessary to carry out and fulfill so much of this agreement as is to be carried out, fulfilled or performed by or on the part of parties of the second part, in proportion to the interests or shares of parties of the second part, in the said water rights, ditch or privi-

leges owned by each of said parties of the second part in said North Fork ditch and water right. *. * *

" 'XIII. If, at any time, the party of the first part shall fail to comply with the terms and conditions of this agreement in furnishing and delivering water to the parties of the second part, or their successors in interest, then it shall forfeit all rights, franchises, privileges, and interest derived from parties of the second part under and by virtue of this agreement, and all rights, franchises, and privileges or interest hereby conceded to it by said parties of the second part or created in pursuance of the terms hereof may be resumed and retained by said parties of the second part, the same as if this agreement had not been made, and all rights and interests of said party of the first part in the said North Fork ditch shall cease and determine. But a temporary failure or interruption, of not more than ten days after said party of the first part has received written notice thereof from said parties of the second part, resulting from unforeseen or unexpected accidents, not attributable to the negligence or fault of party of first part shall not be considered such a failure as to work such forfeiture, it being the intention not to favor or take advantage of mere technical breaches of this agreement, but that same shall receive a fair and liberal construction to promote substantial justice and fair dealing between the parties hereto.

" 'XIV. In all matters and things to be acted upon or done or decided by or concerning the affairs, conduct, management or interests of the parties of the second part under this agreement, a majority in interest of said parties of the second part shall control.' "

On the 27th of June of the same year a supplemental agreement between the complainant and the Bear Valley Land & Water Company was executed, the validity of which is contested by the complainant and is insisted upon by the defendants. That agreement is as follows:

"This supplemental agreement, made this 27th day of June, 1885, by and between the North Fork Water Company of the one part and the Bear Valley Land & Water Company of the other part, all of San Bernardino county, state of California, with intent to modify and render more definite and certain a certain contract heretofore made between said parties and other owners of the North Fork Water ditch and rights, witnesseth:

"That it is understood and agreed that section four of said agreement of May 23rd, 1885, be and the same is hereby stricken out, canceled, and declared of no force and effect.

"It is also understood, consented, and agreed by the said Bear Valley Land & Water Company to and with the said North Fork Water Company and other owners of, and in the North Fork ditch, not members of said corporation, that during the months of June, July, August, and September of each year, the parties of the second part in said agreement of May 23rd, 1885, shall have the right to pass over or draw back any amount of water they may designate from any month to any month of either of the aforesaid months, not exceeding the limit of six hundred inches in any one month and the aggregate amount of water for said four months shall not exceed twenty-two hundred and fifty inches. The last clause of section three of the agreement of May 23rd, 1885, in reference to waste water is stricken out.

"This agreement is intended to embrace all parties drawing water through the North Fork ditch and especially the portion of said water belonging to the Cram and Van Leuven ditch.

"And subject to the modifications herein contained, all other provisions of said agreement of May 23rd, 1885, are in full force and effect.

"In witness whereof, the respective parties hereto have set their hands and seals this day and year first above written.

"North Fork Water Company,
"By L. C. Waite, Pres. North Fork Water Co.
"[Seal.]                 G. W. Beattie, Secy. North Fork Water Co.
"Bear Valley Land and Water Company,
"J. G. Burt, President,
"[Seal.]                 E. A. Holt, Secretary."

The evidence is to the effect, and is indeed in that respect without conflict, that the Bear Valley Land & Water Company and its successors in interest have at all times during the months of June, July, August, September, October, and November of each year turned into the North Fork ditch the specific number of inches of water called for by the contract at the point called the "Divide," and has diverted the remainder of the water of the river for domestic and irrigation purposes at other points than the "Divide." What the complainant contends for is that, because of the contract, all of the natural flow of the river must be divided between the parties thereto at the "Divide," and that substantially one-half of it must be there turned into the North Fork ditch, and by this suit seeks an injunction compelling those things to be done.

[1, 2] Now, in the first place, it is to be remembered that no one is entitled to an injunction as a matter of absolute right. When a contract is broken and any party thereto sustains an injury by reason of such breach, the injured party has an absolute right to maintain an action at law for the recovery of such damages as can be shown to have been sustained by him. But a suit in equity either to enjoin the continuance of such a breach or to enforce the specific performance of the contract appeals to the sound discretion of the chancellor—to his conscience—and the relief so sought will be granted or withheld according to the real equity of the case, in view of all of its facts and circumstances. Now the record in the present case shows that almost immediately after the execution of the contract of May 23, 1885, the Bear Valley Land & Water Company entered into the control of all of the upper waters of the Santa Ana river, and from that time on has continuously delivered at the point called the "Divide" into the North Fork ditch the specific number of inches of water during the summer months called for by the contract, and one-fourth of the natural flow of the river during the winter months, and has otherwise diverted the remaining water of the river for domestic and irrigating purposes at such points as it chose, under which system extensive and immensely valuable horticultural and farming settlements have been established and built up, partly by means of the water so diverted from the Santa Ana river by the Bear Valley Land & Water Company and its successors in interest, and partly by the cachment waters impounded by the Bear Valley dam. The record shows that for many years subsequent to the execution of the contract of May 23, 1885, no objection of any character was made to that course of procedure by the complainant or by any one of the users of water so delivered into the North Fork ditch—the first objection being indicated by a notice served by the complainant in the month of September, 1894, upon the then receivers of the property of the Bear Valley Company demanding the turning of one-half of the natural flow of the river into the North Fork ditch and a division of the waters of the river at the "Divide." Similar demands were subsequently made by the complainant, to none of which was any response made other than the continuance of the diversions and use of the water as before by the Bear Valley Company and those claiming under it.

[3] The mere assertion of the complainant's claim, unaccompanied by acts in vindication and maintenance of it, is of no avail. It was not until April, 1898—nearly 13 years after the making of the contract upon which it is based—that this suit was commenced. Such a long acquiescence in the practical construction thus placed by the Bear Valley Company on the contract in question, under which large and flourishing communities were established and have been built up, at great expense, makes it, in my opinion, wholly inequitable to require the water by which this has been done to be taken from them and put into the North Fork ditch, especially as, according to the effect of the statement of the complainant's own counsel, the purpose of the insistence by the owners of the North Fork ditch that the contract provide that substantially one-half of the water of the river flow in the North Fork ditch at all times was because "they realized that with the growth of settlement and cultivation the time would come when more water would be needed on the north side, and probably by themselves."

[4] That provision, inserted in the contract as paragraph X, is the real foundation of this suit, since it is undisputed that the Bear Valley Company has at all times delivered into the North Fork ditch the specified number of inches during the months of June, July, August, September, October, and November, and one-fourth of the water of the river during the other months. As a matter of course, if the quantity of water to which the complainant is entitled under the contract has at all times been delivered into the North Fork ditch at the "Divide," the fact that the Bear Valley Company diverted the remainder of the water at other points is without substantial harm to the complainant, and would not justify the issuance of an injunction. I am of the opinion that paragraph X of the contract conferred upon the complainant no such right as it contends for. It is to be remembered that all of the water concerning which the parties were contracting was acquired under and by virtue of the law of appropriation, the most essential element of which is its use for beneficial purposes.

[5] The contract in its preamble expressly recites the purpose and object of it in this language:

"Whereas, parties of the second part are desirous of making an arrangement with the party of the first part whereby the supply of water available to said parties of the second part may be made certain and secure during the months of June, July, August, September, October and November, and are further desirous of increasing the present capacity of the said North Fork ditch and completing the construction of the same: Now, therefore," etc.

The parties of the second part then by the contract agreed that all their rights in the water of the river "over and above the amount or quantity herein stipulated to be furnished and allowed to or retained by the parties of the second part" should be perpetually held and enjoyed by the party of the first part for its use, benefit, and disposal, subject to the terms and conditions of the agreement and except as therein limited. Then follows the provision in respect to the specific quantity of water to which the parties of the second part should be entitled, and then a provision to the effect that:

"The surplus of all waters so apportioned to parties of the second part which is not required or desired to be used by the parties of the second part

may be used by the party of the first part always; provided, however, that parties of the second part shall be the sole judges of whether such surplus water is or is not required by them. All waste water at the end of the said North Fork ditch shall belong to the party of the first part."

It is therefore by no means clear that the true meaning of the contract of May 23, 1885, was to require by paragraph X thereof one-half of the water of the river to be put into the North Fork ditch regardless of its beneficial use by others, and regardless of its use by the parties of the second part to the contract. But, if such was the purpose of that paragraph, I think it invalid. Neither the probable future need of one-half of the water of the river by the owners and users of the North Fork ditch, nor the suggested porous character of the soil through which the ditch was built, resulting in loss of water through seepage and evaporation, constitutes sufficient ground upon which to sustain such a provision.

[6] Much of the argument for the complainant seems to be based on the idea that because the Bear Valley Company acquired by the contract of May 23, 1885, an interest in the North Fork ditch and a right to the waste water at the end of it, and a right to convey a portion of its own water through that ditch for use upon lands upon the north side of the river, its failure to divert a portion of its own water through the ditch for use on lands on the north side was wrong and harmful to the complainant, for the reason that the doing so would have resulted in the building up of that section of the country and the consequent enhancement of the value of the complainant's property. However much the failure of the Bear Valley Company to observe its contract in that regard may have damaged the complainant, it is no ground for the granting of the injunction asked for. Besides, such wrong, if wrong it be, is not the basis of the complainant's bill, nor any part of it. Nor is it received how the failure of the Bear Valley Company to carry its own water through the North Fork ditch and to use it upon land upon that side of the river tends to show what the true meaning of the contract is with respect to the quantity of water to which the complainant is thereby entitled.

The evidence undoubtedly shows that the Bear Valley Company continuously recognized the validity of the contract of May 23, 1885, as modified by that of June 27th of the same year. I assume, for the purpose of this decision that the latter was, as contended by the complainant, invalid, although much might be said in support of its validity, particularly in view of the appropriation by the complainant's board of directors of money of that corporation with which to care for the waste water at the end of the North Fork ditch, which the supplemental agreement undertook to restore to the North Fork Company, and of other evidence tending to show acknowledgment by the complainant of the validity of that agreement.

From what has been said it results that the bill as amended must be dismissed at the complainant's cost, and it is so ordered.