[L. A. No. 3003.   In Bank.—October 20, 1911.]

LILLIE A. HULBERT, Administratrix of the Estate of
A. HULBERT, Deceased, Plaintiff, v. CALIFORNIA
PORTLAND CEMENT COMPANY (a Corporation).
Defendant.

SPENCER E. GILBERT, Plaintiff, v. CALIFORNIA PORT-
LAND CEMENT COMPANY (a Corporation), De-
fendant.

INJUNCTION—ABATEMENT OF PRIVATE NUISANCE—DUST RESULTING FROM
CEMENT PLANT—STAY OF INJUNCTION PENDING APPEAL REFUSED—
IRREPARABLE INJURY TO APPELLANT.—Pending an appeal from a
judgment enjoining the operation of a cement plant, because of the

injury caused to adjoining owners of property from the dust produced in the processes of manufacture, the appellate court will not stay the operation of the injunction, notwithstanding the defendant's business is a very important enterprise and the value of its property is relatively much greater than that of the plaintiffs, and that great and irreparable loss will result to it by the enforcement of the injunction, even though it offers to furnish a bond to indemnify the plaintiffs in a sum equal to the value of their properties.

ID.—PLAINTIFF NOT RESTRICTED TO LEGAL REMEDY—TAKING PROPERTY FOR PRIVATE USE.—Under such circumstances, equity will not limit the plaintiffs to their legal remedy and take from them the benefit of injunctive relief. .To permit the cement company to continue its operations to the extent of destroying the property of the plaintiffs and requiring the payment of the full value thereof, would be, in effect, allowing the unauthorized seizure of private property for a use other than a public use.   [Per Melvin, J., and Lorigan, J.]

ID.—MOTION TO STAY INJUNCTION—SUFFICIENCY OF EVIDENCE TO SUSTAIN FINDINGS.—On a motion for a stay of the injunction, the appellate court will not consider the sufficiency of the evidence to sustain the finding of the trial court to the effect that the emission of the cement dust constituted a private nuisance.

ID.—BALANCING RESULTANT INJURIES—GREATER DAMAGES AS RESULT OF ISSUANCE OF INJUNCTION.—On this motion for a stay of the injunction pending appeal it is held by Melvin, J., and Lorigan, J., that, in determining whether the injunction abating the private nuisance should have been granted, the court will not balance the resultant injuries, and hold the injunctive relief improperly granted, for the reason that the hardship inflicted upon the defendant by the granting of the injunction would be very much greater than that which would be suffered by the plaintiff if the nuisance were permitted to continue, as in this state the fact that greater injuries would result to the defendant from the issuance of such injunction is not a reason for its denial.

ID.—STAY OF INJUNCTION PENDING APPEAL NOT NECESSARY OR PROPER.—It is held by Sloss, J., Angellotti, J., and Shaw, J., that the question of the right of a court of equity to refuse the injunction where the injury resulting to the plaintiff from a denial of the relief would be far less than that sustained by the defendant if the injunction were granted, should be left to a consideration of the appeal on its merits, and is not properly determinable on this motion for a stay of the injunction pending appeal; that on such motion the court should consider the rights of the respondent as well as those of the appellants, and that a stay of execution is neither necessary nor proper to the complete exercise of appellate jurisdiction when such stay can be granted only at the risk of destroying rights which will belong to the respondent if the judgment of the lower court shall be affirmed.

APPLICATION to the Supreme Court to stay the operation of certain injunctions, pending appeals from the judgments of the Superior Court of San Bernardino County by which they were granted.   Benjamin F. Bledsoe, Judge.

The facts are stated in the opinion of the court.

Shankland & Chandler, for Petitioner.

Waters & Goodcell, and Wesley H. Beach, for Plaintiffs.

MELVIN, J.—Petitioner has made an original application to this court to suspend the operation of a certain injunction until the decision of the appeals in two cases, in each of which the California Portland Cement Company, a corporation, is the defendant, on the ground that the property of the corporation would be so greatly damaged by the operation of the injunction pending the appeals, that a judgment in defendant's favor would be almost fruitless, while, it is contended, the damage to plaintiffs is easily susceptible of satisfaction by a payment of money.   Petitioner offers to furnish any bond this court may require if the order which is prayed for shall be granted.   As this was [the first case in America, so far as this court knew, in which the operation of a cement plant had been enjoined because of the dust produced in the processes of manufacture, and as the showing which was made indicated that petitioner's loss would be very great if the injunction were enforced at once, an order was entered temporarily staying its operation until both sides to the controversy could be heard.] The court was moved somewhat to such action also because the trial court had made an order staying the operation of the injunction for sixty days, so that this court might have the opportunity of passing upon this application.   Two principal questions are presented: 1. Has the supreme court the authority in aid of its appellate jurisdiction under section 4 of article VI of the constitution to suspend the operation of an injunction pending appeal?   2. If it has such power is this a proper case for the exercise thereof?   Owing to the conclusion which we have reached it is unnecessary to answer the first question authoritatively because assuming a reply to it in the affirmative, we cannot say that the facts of this case

[warrant any other response to the second inquiry than a negative one.]

The salient facts shown by the petitioner are that the California Portland Cement Company is engaged in the manufacture of cement on property situated nearly two miles from the center of the city of Colton in the county of San Bernardino, but not within the limits of said city; that said manufactory is located at Slover Mountain, where the substances necessary to the production of Portland cement are quarried; that long before the surrounding country had been generally devoted to the production of citrus fruits, Slover Mountain had been known as a place where limestone was produced; that quarries of marble and limestone had been established there; that lime kilns had been operated upon said mountain for many years; that in 1891 the petitioner obtained title to said premises and commenced thereon the manufacture of Portland cement; that the said corporation has expended upon said property [more than eight hundred thousand dollars]; that [at the time when petitioner began the erection of the cement plant the land surrounding the plant was vacant and unimproved,] except some land lying to the north, which had been planted to young citrus trees; that these trees were first planted about a year before the erection of the cement plant was commenced (but long after the lime kilns and the marble quarries had been operated); that subsequently, other orange groves had been planted in the neighborhood; that petitioner's plant on Slover Mountain has a capacity of three thousand barrels of cement per day; but that by the judgment of the superior court in two certain actions against petitioner entitled Lillie A. Hulbert, Administratrix etc. v. California Portland Cement Company, a Corporation, and Spencer E. Gilbert, plaintiff, v. the same defendant, the corporation aforesaid was enjoined from operating its plant in such manner as to produce an excess of 88,706 barrels of finished cement per annum; that the regular pay-roll of the company includes the names of about five hundred men who are paid about thirty-five thousand dollars a month; that the fixed, constant monthly expenses for supplies and materials amount to thirty-five thousand dollars; that the California Portland Cement Company employs the best, most modern methods in its processes of manufacture, but that nevertheless there is an unavoidable

escape into the air of certain dust and smoke; that petitioner has no other location for the conduct of its business at a profit; that the land of the Hulbert estate is located from fifteen hundred to twenty-five hundred feet from petitioner's cement works and that Spencer E. Gilbert's land is all within one thousand feet therefrom; that petitioner has diligently sought some means of preventing the escape of dust from its factories; that it has consulted the best experts and sought the best information obtainable, and that it is now and has been for a long time conducting experiments along the lines suggested by the most eminent engineering authorities upon this subject, and that as soon as any process can be evolved for preventing the escape of the dust, the petitioner will adopt such process in its works, and it is believed that a process now constructing with all diligence by petitioner will effectually prevent the escape of dust. Petitioner also alleges that it is easily possible to estimate the damages of the plaintiffs in money while it is utterly impracticable to estimate the damage in money which will be caused to the petitioner by the closing of the plant, and that stopping the plant pending the appeals will cause financial ruin to the chief stockholders of the petitioner, and that the elements of loss averred are irreparable on account of the disorganization of petitioner's working force, loss of market, and deterioration of machinery.

The learned judge of the superior court in deciding the cases in which petitioner here was defendant, described the method of manufacturing cement and the injury to the trees. He said, in part: "The output from these two mills at the present time is about 2500 barrels of cement every twenty-four hours, and to produce this there is fed into the various kilns of the defendant, during the time mentioned, about one and one-half million pounds of raw mix, composed of limestone and clay, ground as fine as flour and thoroughly mixed. This raw mix is fed into the tops of kilns, wherein the temperature varies from 1800 to 3000 degrees Fahrenheit, and through which kilns the heated air and combustion gases pass at the rate of many thousands of feet per minute. The result of this almost inconceivable draft is to carry out, in addition to the usual products of combustion, particles of the raw mix, to the extent of probably twenty tons per day or more, the greater part of which, without question, is carried up into the.

air by the rising gases, and thereafter, through the action of the winds and force of gravity, distributed over the surrounding territory." Speaking of the premises of the plaintiffs he said that because of prevailing westerly winds and on account of the proximity of the mills said lands were almost continually subject to the deposit of dust. In this regard he said: "It is the fact, incontrovertibly established by both the testimony of witnesses and personal inspections made by the court that [a well-nigh continuous shower of cement dust] emanating from defendant's cement mills and caused by their operation, is, and for some years past has been, falling upon the properties of the plaintiffs covering and coating the ground, filtering through their homes, into all parts thereof, forming an opaque semi-cemented encrustation upon the upper sides of all exposed flowers and foliage, particularly leaves of citrus trees, and leaving ineradicable, yet withal plainly discernible marks and evidence of dust, dusty deposits, and grayish colorings resulting therefrom, upon the citrus fruits. The encrustations above mentioned, unlike the deposits occasionally occuring on leaves because of the presence of undue amounts of road dust or field dust, are not dissipated by the strongest winds, nor washed off through the action of the most protracted rains. Their presence, from repeated observations, seems to be as continuous as their hold upon the leaves seems tenacious." The court further found that the deposit of dust on the fruit decreased its value; that the constant presence of dust on the limbs and leaves of the trees rendered the cultivation of the ground and the harvesting of the crop more costly than it would have been under ordinary conditions; and that said dust added to the usual and ordinary discomforts of life by its presence in the homes of the plaintiffs. The court also found that the operation of the old mill of the defendant corporation had occurred with the acquiescence of the plaintiffs and that the defendant had acquired a prescriptive right to manufacture the maximum quantity of cement produced annually by that factory.

In view of such facts solemnly found by the court after trial,[we cannot say that there is reason for a suspension by this court of the injunction] even conceding that we have power under proper circumstances thus to prevent a disturbance of existing conditions, pending an appeal. [We are not

insensible to the fact that petitioner's business is a very important enterprise; that its location is peculiarly adapted for the manufacture of cement; and that great loss may result to the corporation by the enforcement of the injunction. Even if the officers of the corporation are willing to furnish a bond in a sum equal to the value of the properties of Gilbert and of the Hulbert estate here involved, we cannot, under plain principles of equity, compel these plaintiffs to have recourse to their action at law only and take from them the benefit of the injunctive relief accorded them by the chancellor below. To permit the cement company to continue its operations even to the extent of destroying the property of the two plaintiffs and requiring payment of the full value thereof would be, in effect, allowing the seizure of private property for a use other than a public one—something unheard of and totally unauthorized in the law. (*Hennessy* v. *Carmony*, 50 N. J. Eq. 616, [25 Atl. 374]; *Sullivan* v. *Jones & Laughlin Steel Co.*, 208 Pa. 540, [57 Atl. 1065, 66 L. R. A. 712].) Nor may we say, as petitioner urges us to declare, that cement dust is not a nuisance and therefore that the restraint imposed is illegal, even though this is one of the first cases, if not the very first, of its kind, in which the emission of cement dust from a factory has been enjoined, for we are bound by the findings of the court in this proceeding and may not consider their sufficiency or lack of it until we take up the appeals on their merits. The court has found that the plaintiffs in the actions tried were specially damaged by a nuisance maintained by the cement company. This entitles the plaintiffs not only to damages, but to such relief as the facts warrant, and the chancellor has determined that limiting the production in the manner selected is a proper form of protection to their rights. It is well settled in California that a nuisance which consists in pouring soot or the like upon the property of a neighbor in such manner as to interfere with the comfortable enjoyment of the premises is a private nuisance which may be enjoined or abated, and for which likewise, the persons specially injured may recover pecuniary damages. (Code Civ. Proc., sec. 731; *Fisher* v. *Zumwalt*, 128 Cal. 493, [61 Pac. 82]; *Melvin* v. *E. B. & A. L. Stone Co.*, 7 Cal. App. 328, [94 Pac. 390]; *Judson* v. *Los Angeles Sub. Gas Co.*, 157 Cal. 169, [26 L. R. A., (N. S.) 183, 106 Pac. 581].) The last-named case was one in

which the operation of a gas factory had been enjoined and the following language was used: "A gas factory does not constitute a nuisance *per se.* The manufacture in or near a great city of gas for illuminating and heating is not only legitimate but is very necessary to the comfort of the people. But in this, as in any other sort of lawful business, the person conducting it is subject to the rule *sic utere tuo ut alienum non lædas,* even when operating under municipal permission or under public obligation to furnish a commodity. (*Terre Haute Gas Co.* v. *Teel,* 20 Ind. 131; *Attorney-General* v. *Gaslight & Coke Co.,* L. R. 7 Ch. Div. 217; *Sullivan* v. *Royer,* 72 Cal. 248, [13 Pac. 655].) Nor will the adoption of the most approved appliances and methods of production justify the continuance of that which, in spite of them, remains a nuisance. (*Evans* v. *Fertilizing Co.,* 160 Pa. St. 223, [28 Atl. 702]; *Susquehanna Fer. Co.* v. *Malone,* 73 Md. 276, [25 Am. St. Rep. 595, 20 Atl. 900, 9 L. R. A. 737]; *Susquehanna Fer. Co.* v. *Spangler,* 86 Md. 562, [63 Am. St. Rep. 533, 39 Atl. 270].)"

[Petitioner contends for the rule that the resulting injuries must be balanced by the court and that where the hardship inflicted upon one party by the granting of an injunction would be very much greater than that which would be suffered by the other party if the nuisance were permitted to continue, injunctive relief should be denied.] [This doctrine of "the balance of hardship" and the associated rule that "an injunction is not of right but of grace" are the bases of petitioner's argument, and many authorities in support of them have been called to our attention.] In petitioner's behalf are cited such cases as *Richards's Appeal,* 57 Pa. St. 105, [98 Am. Dec. 202], where an injunction which had been sought to restrain defendant from using large quantities of bituminous coal to plaintiff's damage was refused, and the plaintiff was remitted to his action at law, the court saying, among other things: "Whatever of injury may have or shall result to his, the plaintiff's property, from the defendant's works, by reason of a nuisance complained of, is only such as is incident to a lawful business conducted in the ordinary way and by no unusual means. Still there may be injury to the plaintiff, but this of itself may not entitle him to the remedy he seeks. It may not, if ever so clearly established, be a cause in which

equity ought to enjoin the defendant in the use of a material
necessary to the successful production of an article of such
prime necessity as good iron; especially if it be very certain
that a greater injury would ensue by enjoining than would
result by refusal to enjoin." [The same rule was announced in
*Dillworth's Appeal,* 91 Pa. St. 248, a case involving the build-
ing of a powder house near plaintiff,] and in *Huckenstine's
Appeal,* 70 Pa. St. 102, [10 Am. Rep. 669]. [Petitioner admits
that in the later case of *Sullivan* v. *Jones & Laughlin Steel Co.,*
[208 Pa. St. 540, 57 Atl. 1065, 66 L. R. A. 712], the supreme
court of Pennsylvania reached a different conclusion, but con-
tends that the opinion in that case merely defines the word
"grace" as used in Huckenstine's Appeal, the real meaning of
the expression "an injunction is a matter of grace" being that
a high degree of discretion is exercised by a chancellor in
awarding or denying an injunction.] An examination of the
case, however, shows that the court went very much further
than a mere definition of the phrase "of grace." In that case
the defendant had erected a large factory for the manufacture
of steel on land purchased from one of the plaintiffs, but after
many years defendant had commenced the use of "Mesaba"
ore, which caused the emission of great quantities of fine dust
upon the property of plaintiffs. The supreme court of Penn-
sylvania in reversing the decree of the lower court dismissing
the bill went into the matter of "balancing injuries," and "in-
junctions of grace" very thoroughly and we may with pro-
priety, I think, quote and adopt some of its language upon
these subjects as follows: "It is urged that as an injunction is
a matter of grace, and not of right, and more injury would
result in awarding than refusing it, it ought not to go out in
this case. A chancellor does act as of grace, but that grace
sometimes becomes a matter of right to the suitor in its court,
and, when it is clear that the law cannot give protection and
relief—to which the complainant in equity is admittedly en-
titled—[the chancellor can no more withhold his grace than the
law can deny protection and relief] if able to give them.
This is too often overlooked when it is said that in equity a
decree is of grace, and not of right, as a judgment at law. In
*Walters* v. *McElroy et al.* [151 Pa. St. 549] (25 Atl. 125,), the
defendants gave as one of the reasons why the plaintiff's bill
should be dismissed, that his land was worth but little, while

they were engaged in a great mining industry which would ·
be paralyzed if they should be enjoined from a continuance of
the acts complained of; and the principle was invoked that,
as a decree in equity is of grace, a chancellor will never enjoin
an act where, by so doing, greater injury will result than from
a refusal to enjoin. To this we said: The phrase 'of grace,'
predicated of a decree in equity, had its origin in an age when
kings dispensed their royal favors by the hands of their chan-
cellors; but although it continues to be repeated occasionally,
it has no rightful place in the jurisprudence of a free com-
monwealth, and ought to be relegated to the age in which it
was appropriate. It has been somewhere said that equity has
its laws, as law has its equity? This is but another form of
saying that equitable remedies are administered in accordance
with rules as certain as human wisdom can devise, leaving
their application only in doubtful cases to the discretion, not
the unmerited favor or grace, of the chancellor. Certainly
no chancellor in any English speaking country will at this day
admit that he dispenses favors or refuses rightful demands, or
deny that, when a suitor has brought his cause clearly within
the rules of equity jurisprudence, the relief he asks is de-
mandable *ex debito justitiæ*, and needs not to be implored *ex
gratia*. And as to the principle invoked, that a chancellor
will refuse to enjoin when greater injury will result from
granting than from refusing an injunction, it is enough to
observe that it has no application where the act complained
of is in itself, as well as in its incidents tortious. In such case
it cannot be said that injury would result from an injunction,
for no man can complain that he is injured by being prevented
from doing to the hurt of another that which he has no right
to do. Nor can it make the slightest difference that the plain-
tiff's property is of insignificant value to him as compared with
the advantages that would accrue to the defendants from its
occupation? There can be no balancing of conveniences when
such balancing involves the preservation of an established
right, though possessed by a peasant only to a cottage as his
home, and which will be extinguished if relief is not granted
against one who would destroy it in artificially using his own
land. Though it is said a chancellor will consider whether
he would not do a greater injury by enjoining than would
result from refusal and leaving the party to his redress at the

hands of a court and jury, and if, in conscience, the former should appear, he will refuse to enjoin. (*Richards's Appeal*, 57 Pa. St. 105, [98 Am. Dec. 202]); that 'it often becomes a grave question whether so great an injury would not be done to the community by enjoining the business, that the complaining party should be left to his remedy at law.' (*Dillworth's Appeal*, 91 Pa. St. 248)'; and similar expressions are to be found in other cases; 'none of them, nor all of them, can be authority for the proposition that equity, a case for its cognizance being otherwise made out, will refuse to protect a man in the possession and enjoyment of his property because that right is less valuable to him than the power to destroy it may be to his neighbor or to the public.' (*Evans* v. *Reading Chem. Fer. Co.*, 160 Pa. St. 209, [28 Atl. 702].)   The right of a man to use and enjoy his property is as supreme as his neighbor's, and no artificial use of it by either can be permitted to destroy that of the other."

Petitioner lays great stress upon *North Fork Water Co.* v. *Medland*, 187 Fed. 169, in which in the opinion by Judge Ross, formerly a member of this court, the following appears: "Now, in the first place, it is to be remembered that no one is entitled to an injunction as a matter of absolute right.   When a contract is broken and any party thereto sustains an injury by reason of such breach, the injured party has an absolute right to maintain an action at law for the recovery of such damages as can be shown to have been sustained by him.   But a suit in equity either to enjoin the continuance of such a breach or to enforce the specific performance of the contract appeals to the sound discretion of the chancellor—to his conscience— and the relief so sought will be granted or withheld according to the real equity of the case, in view of all its facts and circumstances."   Petitioner also cites *Mountain Copper Co.* v. *United States*, 142 Fed. 625, [73 C. C. A. 621], in which the opinion was also by Judge Ross.   In that case the court refused to enjoin the operation of defendant's smelter relying largely upon the early cases from Pennsylvania which declare the "balance of hardship" doctrine and that an injunction is *ex gratia* and not *ex debito justitiæ*, and citing other cases including the well known *Madison* v. *Ducktown Sulphur, Copper & Iron Co.*, 113 Tenn. 331, [83 S. W. 658].   While we have the utmost respect for the learned author of these opinions

and for the decisions of the United States circuit court of appeals for the ninth circuit, we cannot agree with the principles announced in the two cases decided by that court cited above. In connection with the case of *Mountain Copper Co.* v. *United States,* 142 Fed. 625, [73 C. C. A. 621], it is interesting to note that in his dissenting opinion therein Judge Hawley quotes from *Fisher* v. *Zumwalt,* 128 Cal. 493, [61 Pac. 82], and two other Californian cases, *Daubenspeck* v. *Grear,* 18 Cal. 445, 447, and *Natoma Water & Min. Co.* v. *Clarkin,* 14 Cal. 544, 551, and after an analysis of them concludes with this brief but excellent statement of the rule which he deduced from them: "The pith, point, and substance of this whole matter is that where the acts of a party, whether individuals or corporations, wealthy or poor, destroy the substance of complainant's estate, whether it be of great or of but little value, an injunction should be issued. This is the underlying principle, the essence and effect of all the decisions upon the subject which distinguish this character of cases from those where the injury is slight and trivial and the damage not irreparable and not absolutely destructive of complainant's estate."

The Mountain Copper Company case has also been criticised by the supreme court of Arizona, as well as the later case of *McCarthy* v. *Bunker Hill & Sullivan Mining & Con. Co.,* 164 Fed. 927, [92 C. C. A. 259]. In *Arizona Copper Co.* v. *Gillespie,* 12 Ariz. 203, [100 Pac. 470], this language was used: "Counsel press upon us the proposition that we should consider the comparative damage that will be done by granting or withholding an injunction in this case, alleging that the effect of an injunction will be to stop the operation of extensive works, deprive thousands of persons of employment, and cause loss and distress to other thousands. It is undoubtedly true that a court should exercise great care and caution in acting where such results would follow. It should very clearly appear that the acts of the defendant are wrongful, and that the complainant is suffering substantial and irreparable injury, for which he cannot secure adequate compensation at law. A number of eminent courts support the contention of appellant that the comparative injury to the parties in granting or withholding relief must also be considered. Among the cases so holding is the case of *McCarthy*

*v. Bunker Hill & Sullivan Mining & Con. Co.,* 164 Fed. 927, [92 C. C. A. 259], decided by the circuit court of appeals for this circuit, a court for which we entertain the highest respect, (which exercises an appellate jurisdiction over this court in certain cases) ; and, if this case were reviewable there, we should not feel at liberty to express views in conflict with those of that court. But this case is reviewable only by the supreme court of the United States, and we cannot find, as suggested by the circuit court of appeals, that that court has given adherence to the doctrine. It seems to us that to withhold relief where irreparable injury is, and will continue to be, suffered by persons whose financial interests are small in comparison to those who wrong them is inconsistent with the spirit of our jurisprudence. It is in effect saying to the wrong-doer, 'If your financial interests are large enough so that to stop you will cause great loss, you are at liberty to invade the rights of your smaller and less fortunate neighbors.' We prefer the doctrine adhered to by Judge Hawley in his dissenting opinion in *Mt. Copper Co.* v. *United States,* 142 Fed. 625, [73 C. C. A. 621], and by Judge Sawyer in *Woodruff* v. *North Bloomfield Gravel Min. Co.,* 18 Fed. 753. In the latter cases it is said: 'Of course great interests should not be overthrown on trifling or frivolous grounds, as where the maxim *de minimis non curat lex* is applicable; but every substantial, material right of person or property is entitled to protection against all the world. It is by protecting the most humble in his small estate against the encroachments of large capital and large interests that the poor man is ultimately enabled to become a capitalist himself. If the smaller interest must yield to the larger, all small property rights, and all small and less important enterprises, industries, and pursuits would sooner or later be absorbed by the large, more powerful few; and their development to a condition of great value and importance, both to the individual and the public, would be arrested in its incipiency.' To the same effect are the remarks of Judge Marshall in *McCleery* v. *Highland Boy Gold Min. Co.,* 140 Fed. 951."

Petitioner cites, among others, the following cases, which, although tending for the most part to support the rule for which he contends, are not we think in accord with the best modern ideas upon this subject and with the current of

Californian authorities: *McBryde* v. *Sayre,* 86 Ala. 458, [5 South. 791, 3 L. R. A. 861]; *Chambers* v. *Iron Co.,* 67 Ala. 358; *Clifton Iron Co.* v. *Dye,* 87 Ala. 468, [6 South. 192]; *Riedeman* v. *Mt. Morris Elec. Co.,* 56 App. Div. 23, [67 N. Y. Supp. 391]; *Barnard* v. *Sherley,* 135 Ind. 547, [41 Am. St. Rep. 454, 34 N. E. 600, 35 N. E. 117, 24 L. R. A. 568]; *Gilbert* v. *Showerman,* 23 Mich. 449; *Lloyd* v. *Catlin Coal Co.,* 210 Ill. 460, [71 N. E. 335]; *Amelia Mill Co.* v. *Tenn. Coal & Iron Co.,* 123 Fed. 811; *Edwards* v. *Allouez Min. Co.,* 38 Mich. 46, [31 Am. Rep. 301]; *Atchison* v. *Peterson,* 20 Wall. 507, [22 L. Ed. 414], and *Stewart Wire Co.* v. *Lehigh C. & N. Co.,* 203 Pa. St. 474, [53 Atl. 352]. The last-named case was really decided upon the doctrine of laches and not that of "balance of detriment." Many of the cases to which our attention is called by petitioner are not strictly in point. For example in *New York City* v. *Pine,* 185 U. S. 93, [22 Sup. Ct. 592, 46 L. Ed. 820], the supreme court of the United States recognized the principle that, where the defendant in an injunction suit has "the ultimate right," that is to say, where it is entitled to continue with its work by eminent domain proceedings, a permanent injunction will be denied, but a temporary injunction may be granted to compel the defendant to make compensation.

In *Georgia* v. *Tenn. Copper Co.,* 206 U. S. 230, [27 Sup. Ct. 618, 51 L. Ed. 1038], there is a *dictum* to the effect that if the plaintiff were a private individual the court might consider the balance of hardship, but from this Harlan, J., dissented. One of the most instructive cases upon this subject is *American Smelting & Rep. Co.* v. *Godfrey,* 158 Fed. 225, [89 C. C. A. 139]. In that case Judge Riner says: "The fact, urged by counsel, that these smelters are located at a place where by, reason of its relation to the railroads and mines is most convenient for smelting purposes does not, in our judgment, constitute any defense to a bill to abate a nuisance; neither can a court take into consideration the fact that the business is conducted in a proper and reasonable manner employing the latest and best devices and instrumentalities, where the evidence shows, as in this case, that when so operated and conducted, it still results in very great damage to, if not the total destruction of, complainant's property, and is a menace to health. 'The rights of

habitation are superior to the rights of trade, and whenever they conflict, the rights of trade must yield to the primary or natural right.' (1 Wood on Nuisances, secs, 514-17 and 23.) It is also insisted that the injury to the appellants and to the public if an injunction issues, so greatly exceeds the injury to the appellees if denied, that an injunction should not have been granted. We think it may well be doubted whether this statement is supported by the record. The parties to this suit, upon both sides, have important and very valuable interests affected by the decree, and it would indeed be difficult to say upon the facts disclosed by the record, which side would suffer the greater injury. However that may be, we do not think the fact that an actual injury resulting from the violation of a right is small, and the interest to be affected by an injunction is large, should weigh against the interposition of preventive power in equity, when it is clear that on one hand a right is violated and on the other a wrong is committed." He then discusses the leading cases. This and the appended opinion of Marshall, district judge, rendered in the circuit court, are very illuminating.

Our attention has been directed to certain Californian cases which, according to petitioner's belief, support the rule with reference to the "balancing of injury." These are *Peterson* v. *City of Santa Rosa,* 119 Cal. 387, [51 Pac. 557], and *Williams* v. *Los Angeles Railway Co.,* 150 Cal. 593, [89 Pac. 330]. In the latter case the court was considering the refusal by the superior court of an injunction *pendente lite.* While it contains some language perhaps susceptible of the meaning for which petitioner contends, the court was really considering the principle announced in *Hicks* v. *Michael,* 15 Cal. 116, that an injunction should not be issued before a hearing on the merits except in cases of urgent necessity. In *Peterson* v. *Santa Rosa,* 119 Cal. 387, [51 Pac. 557], the following language is found: "In *Attorney General* v. *Council of Birmingham,* 4 Kay & J. 528, the court indicated that in such cases only the right of plaintiff to relief, rather than the question of inconvenience to defendants was to be considered, although the latter represented a large population. We regard the foregoing as an extreme statement and deem it more proper to adopt the language of Swayne, J. in *Parker* v. *Winnipiseogee Etc. Co.,* 2 Black (U. S.) 545, [17 L. Ed. 333]:

'After the right has been established at law a court of chancery will not, as of course, interpose by injunction. It will consider all the circumstances, the consequences of such action, and the real equity of the case.' In *Curtis* v. *Winslow*, 38 Vt. 690, it was said: 'In determining the right of a party to an injunction after a verdict in his favor by a court of law, the court will consider the relative loss to either party, the character of the property for which protection is sought, the character of the locality in which the nuisance exists, and whether the injury is properly compensable in damages.' If the injury is only occasional, and the damages small, accidental, rather than a probable and necessary consequence, an injunction will be denied. (*Wood* v. *Sutaliff*, 8 Eng. L. & Eq. 217.) In short, each case must be governed by the circumstances that surround it and by relative equities. (Wood on. Nuisances, sec. 550.)" Nevertheless, the department sustained the judgment granting an injunction by which defendant, a large city, was restrained from polluting the .waters of Santa Rosa Creek although plaintiff's damages were found by the jury to amount merely to one dollar. The case is really in exact accord with the views which we have expressed above for this language is used with reference to plaintiff: "Her right as a riparian owner was, not only to have the water of the stream flow over her land in its usual volume, but to have it flow in its natural purity, and such pollution of the stream by the defendant as substantially impaired its value for the ordinary purposes of life, and render it measurably unfit for domestic purposes, is an actionable nuisance, and the fact that the defendant is a municipal corporation does not enhance its rights or palliate its wrongs in this respect. (Wood on Nuisances, sec. 427; High on Injunctions, 3d ed., sec. 810.)" We are convinced that upon reason and upon great weight of authority we should deny petitioner's prayer, considering the subject upon the assumption that we have power under the constitution in aid of our appellate jurisdiction in a proper case to suspend the operation of a prohibitory injunction pending an appeal.

Let the temporary order staying the operation of the injunction be dismissed and the petition be denied.

Lorigan, J., concurred.

Mr. Justice Henshaw deems himself disqualified to participate herein, and therefore declines to act.

SLOSS, J., concurring.—I concur in the order. ⟦It seems to me, however, that the discussion concerning the right of a court of equity to refuse an injunction where the injury resulting to the plaintiff from a denial of the relief would be far less than that sustained by the defendant if the injunction were granted, is applicable to a consideration of appeals on their merits, rather than to the question here involved.⟧ If the court may balance the extent of the losses to be suffered by the respective parties, it exercises its discretion in this behalf when it grants or refuses the injunction. In this case the lower court has determined that it was essential, or at least proper, for the protection of the plaintiffs' rights that the defendant should be restrained. We are not now reviewing the correctness of that determination. The petitioner cannot, of course, ask us in this proceeding to stay the force of the injunction on the ground that the trial court abused its discretion or that it erred otherwise in granting the injunction. What is claimed is that a suspension of the judgment "is necessary or proper to the complete exercise" of our appellate jurisdiction (Const., art. VI., sec. 4); it is claimed that a refusal to stay the injunction will so affect the subject of the controversy that, if the judgment should ultimately be reversed, the appellant will in large measure be deprived of the fruits of its successful appeal.

But we must consider the rights of the respondents, as well as those of the appellants. If the judgment of the court below is right, the plaintiffs are absolutely entitled to have the wrongful acts stopped, not only after the determination of the appeal, but pending the appeal. Under the findings the acts complained of are inflicting a continuing injury upon the plaintiffs and their lands, an injury of a kind which has always been regarded by courts of chancery as irremediable and not capable of adequate redress by damages. If the appellant may ask that it shall not lose the fruits of an appeal which may turn out to be meritorious, the respondents are in at least as good a position to demand that the appellate court shall not irrevocably take away from them the benefit which they have already won and which will be confirmed to them if the judg-

ment should be sustained. The exercise of the appellate jurisdiction must contemplate the possibility of affirmances as well as reversals. I do not think a stay of execution can be said to be necessary or proper to the complete exercise of appellate jurisdiction when such stay can be granted only at the risk of destroying rights which will unquestionably belong to the respondent if the judgment of the lower court shall be affirmed. This will always be the situation in the case of an appeal from a judgment enjoining acts which are found to be destructive of the plaintiff's real property. I think, therefore, that in such cases, at any rate, this court should not undertake to suspend the force of a prohibitory injunction pending appeal. (*Swift* v. *Shepard,* 64 Cal. 423, [1 Pac. 493]. The statutory law gives no stay, and there should be none, unless the trial court, which is in the best position to weigh the respective equities, concludes to exercise its power (*Pasadena* v. *Superior Court,* 157 Cal. 781, [109 Pac. 620]) to suspend the injunction until the merits are finally determined.

It may be suggested, further, that the effect of an order by this court suspending the operation of a prohibitory injunction is to reverse, *pro tanto,* the judgment granting the injunction, and that in advance of a hearing on the merits. That this is so will appear more clearly if we suppose the case of an appeal from an order of the superior court granting an injunction *pendente lite.* In such case, an application for a suspension of the injunction pending the appeal could be urged upon precisely the same grounds as those here presented by petitioner. The thing decided by the trial court, in the case supposed, was that defendant should be restrained until a trial on the merits, or until that court should order otherwise. That conclusion is reviewable on appeal, but to suspend the order before a hearing of the appeal would clearly be to set aside the very thing decided below, viz., that the defendant should be enjoined until a trial or a further order. The situation does not differ where the injunction is embraced in a final judgment. There, too, it is a part of the adjudication that the defendant should be enjoined at once, and this adjudication should not be set aside on appeal before a hearing on the merits of the appeal.

Angellotti, J., and Shaw, J., concurred.